**REPORTED**

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

No. 1774

September Term, 2013

JAMES LEE TRAVIS

v.

STATE OF MARYLAND

Nazarian,
Reed,
Moylan, Charles E., Jr.
 (Retired, Specially Assigned),

JJ.

Opinion by Moylan, J.

Filed: August 26, 2014

Lack of consent on the part of the victim is an indispensable element of the crime of rape and of the various degrees of sexual offense. Proof of lack of consent will routinely consist of a negative response, either explicit or implicit, on the part of the victim. The key issue on this appeal arises, however, from the fact that the lack of consent may, under certain circumstances, be proved simply by showing a non-response. The negative response and the non-response may have the same effect but they are proved in very different ways. It is that difference in proof that gives rise to this appeal.

The appellant, James Lee Travis, was convicted in the Circuit Court for Worcester County by Judge Thomas C. Groton, III, sitting without a jury, of second-degree rape, a second-degree sexual offense, a third-degree sexual offense, and second-degree assault. For the second-degree rape, the appellant was sentenced to a term of imprisonment of 20 years with all but 10 years suspended to be followed by two years of probation. For sentencing purposes, the remaining convictions merged into that for second-degree rape. On appeal, the appellant raises three contentions, claiming

1.      that the State's evidence was not legally sufficient to support his convictions;

2.      that the verdicts of guilty were inconsistent with his acquittal on the charge of a fourth-degree sexual offense; and

3.      that Judge Groton erroneously found him guilty of a second-degree sexual offense after earlier having announced that his verdict on that charge was "not guilty."

## Legal Sufficiency of the Evidence

Although there were convictions for other peripheral sexual offenses, it will be convenient narratively to focus primarily on the conviction for rape. Rape was the core issue at the appellant's trial and it is for rape that he is serving an effective sentence of ten years imprisonment.

What began as a convivial social evening among four acquaintances ultimately, after several hours of reasonably heavy drinking, turned criminal. The situs where the evening's activities both began and concluded was the small efficiency apartment of Kelly Belay in Ocean City. On the evening of May 23, 2013, the rape victim, a young woman who had been a friend of Ms. Belay since high school, went to her friend's apartment to celebrate the victim's birthday. The two young women initially "hung out, sat on the balcony, [and] had a couple beers."

They were joined in the course of the evening by two young men, the appellant and one Kwamaine Fisher, a friend of Ms. Belay. There had been no prior romantic relationship between the victim and the appellant, but she had seen him "socially" "quite a few times." The foursome sat on the balcony for "45 minutes to an hour." They then all walked across the street to a bar called Pit-N-Pub and stayed there for "maybe about an hour and a half." While at the pub, the victim consumed "one shot and maybe two beers." The victim could not recall what the appellant had to drink at the pub, but she did remember that all four of them had "a shot" at midnight. All four of them left the Pit-N-Pub at about 1:00 a.m., went

across the street to get some food at a 7-Eleven, and then went back to Ms. Belay's apartment. The group "sat around" for another hour or more.

The victim decided to go to bed at approximately 2:00 or 2:30 a.m. She went to bed before everyone else because she had to be at work the following morning at 8:00 a.m. She went to bed in the interior room of the efficiency apartment, while the other three remained outside on the balcony. The victim went to sleep on a "Murphy bed," "a bed that pulls down out of the wall." She testified that as she was going to bed, she felt tired and "a little bit" intoxicated. She went to bed in her clothes, the same clothes that she had worn to work that day, black pants and a black shirt. Significantly, she went to bed alone and she went to sleep.

In her testimony, Ms. Belay added that throughout the course of the evening, the victim and the appellant were not together as a couple. She confirmed that she did not believe that anything flirtatious was going on between them. She further testified that it was her impression, before she herself fell asleep, that Kwamaine Fisher and the appellant were not intending to spend the night at her apartment. The appellant specifically told Ms. Belay that he was going to drive home because he was not intoxicated.

Approximately two hours after she went to sleep, the victim awoke in the process of being raped. She remembered "waking up and James was having sex with me." She was on her back in the bed and her pants had been pulled down to her knees. Her shirt was still on. Her testimony was that the appellant was on top of her, "his penis was in [her] vagina,"

- 3 -

and he was "thrusting, like if you were having sex." When she "woke up and realized ... what he was doing," she "put [her] hand on his chest to try to push him off." When he did not stop, she told him either, "No, I can't do this," or "No, this can't happen." When she spoke those words, the appellant "stopped," got up, pulled up his pants, and walked out of the apartment without saying a word. She looked at her cell phone and saw that the time was 4:42 a.m. The victim immediately "got [her] belongings," tried unsuccessfully to wake Fisher, who was "passed out" on the floor, and left the apartment in her car.

At this point, we note that there is no dispute about the occurrence of the act of sexual intercourse per se. The appellant, in his statement to the police which he does not challenge, acknowledged that he had sexual intercourse with the victim. His defense was that the intercourse was consensual. He now argues, somewhat self-righteously, that he stopped immediately upon being told to stop by the victim. When asked by the police, however, if the victim had been awake when he first penetrated her, "he advised [the police] that he wasn't sure if she was awake or not at the time because he hadn't looked at her eyes to see if they were open." The appellant also told the police that he did not think he had ejaculated when he hurriedly dressed and left the apartment, prompting the police comment, "which I found unusual."

Saving for the moment our discussion of the consent issue on the rape charge, there is no dispute about the proof of the actus reus of second-degree rape or the actus reus of the necessarily lesser included simple assault. It is only with respect to the proof of the second-

degree sexual offense and the third-degree sexual offense that we turn to the victim's testimony about her semi-conscious memory of what occurred before she came fully awake in the process of being raped. Judge Groton expressly found the victim to be completely credible. He accepted, as was his factfinding prerogative, not only her fully conscious memory but also her hazier quasi-conscious memory. The victim testified:

> A. <u>I remember falling asleep on my right side</u>, and <u>I don't remember him getting in bed.</u> I don't – <u>I remember him pulling on my left shoulder to turn me over.</u> And I remember him – <u>I remember him kissing me on the mouth. I remember him putting his hands under my shirt.</u> I remember him – I remember rolling – trying to roll back over. And <u>I remember him pulling my pants down while I was on my right side. He was behind me. I remember him trying to have anal sex with me. I remember him pulling on my shoulder a few times hard enough where I had a bruise on my shoulder.</u> And when I woke up was when – I mean, I remember – <u>I remember him trying to put his penis in my mouth.</u>

> Q. Can you describe how that happened?

> A. <u>I had rolled over on my left side. So we would have been facing each other. And I remember him like moving towards the top of the bed so he was – he was lying above me.</u>

> THE COURT: <u>At what point did these things occur?</u>

> THE WITNESS: Before – <u>before I woke up and tried to push him off.</u>

> THE COURT: Immediately before? Some time before?

> THE WITNESS: I felt like it was right before. I mean, between when I went to bed at 2:00, around 2:00, and then when I woke up.

> THE COURT: Okay.

> THE WITNESS: I don't – I don't know the time – the time frame.

[PROSECUTOR]:  Did you fully wake up during any of this?

A.  No.

Q.  Okay.  So –

A.  I remember – I remember – I remember it happening.  I – it's hard to – it's hard to explain.  It almost felt like a dream.

Q.  Okay.

A.  I think that's why I kept trying to roll over.

Q.  Did you realize what was happening?

A.  No.

Q.  So when you say you remember him trying to put his penis [in] your mouth, what exactly do you recall happening?  You said – you began to describe that he went to – he scooted up the bed.

A.  Right.

....

Q.  Can you describe what you remember happening?

A.  I remember him – my mouth was closed.  I remember him trying to force his penis into my mouth.  And I assume it was because I was so tired and I had been drinking, but I didn't have the strength – all I could do was try and keep my mouth closed, my teeth closed, so that's what I did.

Q.  And at this time, is this when you described that you were face to face?

A.  Yes.

Q.  And when you say him trying to put his penis in your mouth, was there any contact between his penis and your mouth?

A. It touched my teeth.

Q. And what did you do at that time?

A. I remember rolling over.

Q. Do you recall if you went back to sleep after that?

A. I don't recall. I don't know if I fell back asleep. I don't know.

Q. And the next thing – is the next thing you remember happening after that waking up to him having sex with you?

A. I – I don't remember the order of how everything happened. When – when he was – the last thing that happened was him on top of me, having sex with me. I don't remember what happened before that.

(Emphasis supplied).

In terms of the legal sufficiency of the proof of a second-degree sexual offense, fellatio qualifies as a "sexual act," which is the gravamen of the crime. For the appellant to place his penis inside the lips and in contact with the teeth of the victim qualifies as oral-genital contact within the contemplation of the term "fellatio." Thomas v. State, 301 Md. 294, 321-22, 483 A.2d 6 (1984). The appellant does not claim that the act of fellatio never occurred or that it was consensual.

In terms of the legal sufficiency of the proof of a third-degree sexual offense, the required "sexual contact" for that offense is defined as "an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification, or for the abuse of either party."

- 7 -

Just as the rape necessarily included a second-degree or simple assault, so too, of course, did the second-degree sexual offense and so too did the third-degree sexual offense. The second-degree assault, an act of offensive touching, was proved three times over.

Although the appellant seeks to characterize the victim's failure to report the rape to the police for a week as exculpatory, a fair reading of the victim's post-rape behavior could just as readily, if not more readily, be deemed strong evidence that the sexual intercourse had, indeed, been non-consensual. To get up suddenly within two hours of having gone to bed and to drive home at 5:00 a.m. is not a routine reaction for one who is comfortably content with the events of the preceding evening. The victim testified that she was reluctant to go to the police because she was not at all sure whether the appellant's contact with her, because of her having been asleep and because of her antecedent drinking, even constituted a crime. She was uncomfortably aware that her own behavior may have placed her in a compromised position. She recounted what had happened to her that very day, however, to Kelly Belay. She also promptly reported what had happened to Kwamaine Fisher.

Very persuasive evidence of her state of mind, moreover, was what happened five days after the attack. She was out with friends at a bar when she unexpectedly saw the appellant. He walked by, turned and looked at her, and kept walking. Feeling as if she were going to have a panic attack, she went outside. An employee of the bar, Mike Bowling, noticed the strange interaction between the two. When he went outside to smoke a cigarette, he saw the victim "completely distraught" and crying. He spoke to her for 20 to 25 minutes

and the victim recounted to him what had happened five days earlier. He went back inside and told the appellant to leave the bar. It was Bowling, moreover, who persuaded the victim to report the incident to the police the next day. She did.

The day after her report to the police, the victim was seen by a forensic nurse examiner who conducted an external examination of her based on her complaint of pain in her genital area. The nurse observed redness to the posterior fourchette area of her genitals.

## Factfinding Is Not Our Job

Before turning to the legal issue of what constitutes proof of non-consent, a comment is in order about the pertinence of certain standard defense arguments we invariably receive on the issue of the legal sufficiency of the evidence in cases of this sort. In arguing legal sufficiency here, the appellant observes:

> At the conclusion of direct examination [the victim] testified that she did not consent to any of the sexual contact that occurred between herself and Appellant. <u>Her actions</u>, however, <u>tell a different story.</u>

(Emphasis supplied).

The appellant goes on to put a decidedly puritanical spin on the behavior of the victim, including such misogynistic, if not indeed mid-Victorian, insinuations as the revelation that she was not wearing any underwear and the disapproving observation that she had been drinking all evening. For shame! Even accepting, <u>arguendo</u>, such characterizations, however, what difference should it make to us that her actions tell a different story? Is the appellant trying to persuade us of facts as if we were the factfinders?

- 9 -

Virtually every crime testified to by multiple witnesses could give rise to half a dozen conceivable scenarios or different stories. That is why we have factfinders. We, on the other hand, are not concerned with those other possible stories, because we are not factfinders. The factfinding job has already been done by someone else. All that matters at this juncture is that the factfinding judge believed the victim's story. Unless clearly erroneous (a rare phenomenon, indeed), Judge Groton's findings of fact are the only facts in the case as far as we are concerned. There are no other stories. No other facts or factual scenarios even exist and it is pointless, therefore, to bring them up. In assessing legal sufficiency, we are required to take that version of the evidence most favorable to the prevailing party. What then is the appellant seeking to do by beguiling us with "different stories" which are immaterial to the only legal issue before us? An appraisal of legal sufficiency is not a proper venue for jury argument. Appellate concern is not with what **should** be believed, but only with what **could** be believed.

## The Absence of Consent

The appellant's core argument on the issue of lack of consent is too clever by half. Maryland Code, Criminal Law Article, § 3-304(a) describes at least three (and perhaps five) modalities by which one might commit the crime of second-degree rape.

> (a) *Prohibited*. – A person may not engage in vaginal intercourse with another:
> (1) by force, or the threat of force, without the consent of the other;
>
> (2) if the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual, and the person

performing the act knows or reasonably should know that the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual; or

(3) if the victim is under the age of 14 years, and the person performing the act is at least 4 years older than the victim.

Regardless of which particular modality is employed on a particular occasion, second-degree rape is a single crime with a single penalty provision. Notwithstanding the variation in modalities, the critical denominator is the act of engaging in sexual intercourse with a woman without her consent. The modalities simply represent different ways in which that consent may be found to have been lacking. Consent may, of course, be lacking because it was expressly denied. Consent may also be lacking because it was implicitly denied, the denial being evidenced by either some degree of resistance or by a rational fear of resisting. By way of significant contrast, consent may also be lacking because the victim, for a variety of reasons, may have been incapable of giving any consent at all or incompetent to give legally cognizable consent. All of these absences of consent, however, are simply variations on a common theme. In this case, the charging document simply alleged, with respect to the rape, a violation of § 3-304(a). It did not particularize which precise modality or combination of modalities the appellant employed.

Indeed, until the 1976 and 1977 legislative sessions codifying the various sexual offenses in Maryland, the crime of rape in Maryland was the common law felony of that name. The statutory codification was essentially for the purpose of graduating the possible penalties for different circumstances under which the rape or other sexual offense was

committed. It was well explained by "Rape and Other Sexual Offense Law Reform in Maryland, 1976-1977," 7 U. Balt. L. Rev. 151, 152 (1977):

> Prior to the 1976 session of the Maryland Legislature, the Maryland rape statute was primarily a sentencing law, fixing the penalties without actually defining the crime. Therefore, in order to discern what constituted the crime of rape, an examination of the common law was necessary. ...
>
> Common law rape was often defined as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." However, other courts have defined the crime in more general terms as "unlawful carnal knowledge of a woman without her consent." Other typically required elements for common law rape were force, absence of the victim's consent, and penetration.

(Emphasis supplied).

In Goldberg v. State, 41 Md. App. 58, 64, 395 A.2d 1213 (1979), this Court spoke to the same effect.

> Prior to 1976, the Maryland rape statute was primarily a sentencing law, fixing the penalties without actually defining the crime. The common law definition of rape that has been applied in Maryland is: "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim."

(Emphasis supplied). See also State v. Rusk, 289 Md. 230, 424 A.2d 720 (1981).

Basically, the underlying crimes, particularly rape, were substantively unchanged by the codification. The new statutes, to be sure, provided some precise definitions, a process which at the earlier common law would have been left to judicial interpretation. Section 3-301, providing a number of definitions, however, did not undertake to define the word

"consent" or the phrase "without the consent of the other." What is pertinent in such a case of non-statutory definition is § 3-302, which provides:

> In this subtitle <u>an undefined word or phrase that describes an element of common-law rape retains its judicially determined meaning</u>, except to the extent it is expressly or impliedly changed in this subtitle.

(Emphasis supplied).

The appellant's specific contention is that his conviction for rape was necessarily erroneous because of "the trial judge's erroneous belief that lack of consent was not a required element of these offenses in this case." That is a bold charge and we do not remotely find any merit in it. It may nonetheless be a profitable exercise to figure out precisely how the appellant could have arrived at such a conclusion.

In the course of closing argument in this non-jury trial, Judge Groton, in various exchanges with counsel, made it unmistakably clear that his specific finding was that the victim was "physically helpless" by virtue of "being asleep." "She was asleep when he began." "I'm basing my decision on the fact that she was asleep." "[W]hen the sexual intercourse occurred ... when it started, she was asleep." The judge and both of the lawyers were walking through the reviewing process together, looking at all of the statutory provisions and opining as to which modalities fit the case and which did not.

In one exchange, during closing argument, between defense counsel and Judge Groton, the discussion focused in on which of § 3-304's (the second-degree rape statute) five modalities for establishing non-consent would best fit the facts of this case. Subsection

- 13 -

(a)(3) could immediately be eliminated as inapplicable, dealing with a victim "under the age of 14 years." The first of subsection (a)(2)'s three victim characterizations – that of being a "mentally defective individual" – was also, by definition, eliminated. Three plausibly eligible modalities remained:

[1.] (a)(1)  by force, or the threat of force, without the consent of the other;

[2.] (a)(2)  if the victim is ... a mentally incapacitated individual;

[3.] (a)(2)  if the victim is ... a physically helpless individual[.]

The discussion involved a comparison of those three closely related situations, all producing a functionally similar result, to wit, the absence of consent. We note again that these are not three different crimes. They are simply three different but closely related modalities for committing the same crime. The court was discussing the statutory definition of second-degree rape. Specifically, the court was contrasting (a)(1) with the special conditions or statuses of a victim dealt with in (a)(2).

> [Section] 3-304 is rape in the second degree:  A person may not engage in vaginal intercourse with another, number one – a, number one, <u>by force, or threat of force, without the consent of the other.</u>
>
> <u>Then you go on to number two:</u> <u>If the victim</u> is mentally – <u>is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual</u>, and the person performing the act knows or reasonably should know that the victim is <u>mentally defective, which we don't have,</u> mentally incapacitated or physically helpless.
>
> And <u>what I'm saying is, as to subsection 2</u>, mentally incapacitated or physically helpless, if, in fact – <u>my interpretation is that sleep would cause a person to be mentally incapacitated or physically helpless,</u> and, therefore, <u>he's in violation of (a)(2), having nothing to do with consent.</u>

- 14 -

(Emphasis supplied).

"... having nothing to do with consent." Those are, alas, six unfortunate words – but unfortunate only in the sense that they have generated such perplexing appellate mischief. There was nothing wrong with the verdict. Judge Groton found, with solid support in the evidence, that the victim was asleep when the appellant engaged in sexual intercourse with her. As will be discussed infra, to be asleep is ipso facto to be "physically helpless." In assessing sexual intercourse with a physically helpless individual, the absence of consent is automatic, as a matter of law, and does not have to be redundantly proved a second time over. The appellant does not challenge the efficacy of the evidence to support the verdict. The evidence established that the appellant engaged in sexual intercourse with the victim without her consent. That is what the judge found the appellant guilty of having done. The appellant complains only about the words the judge used in discussing the crime. Due process requires that the element of lack of consent actually be proved. It is not concerned with how the process of proving it is articulated. The appellant essentially is complaining that the judge did not articulate his reasoning more artfully.

When a judge renders a verdict in a bench trial, it is not like taking a guilty plea or taking a waiver of a jury trial. There are no prescribed drills that the judge must perform on the face of the record. On review, we are concerned with what the judge actually did. We are not obsessed with the words he used to describe what he did. Due process requires that

- 15 -

the element of lack of consent actually be proved by legally sufficient evidence. It is not concerned with how the process of proving it is articulated.

Even in terms of the words used, moreover, the appellant's argument collapses once we take a healthy step back and look at the totality of the context in which the words were uttered. The appellant has grabbed six words out of a larger context and has ignored the context. The context was a discussion between court and counsel that had nothing to do with whether the victim had somehow consented to sexual intercourse with the appellant. The discussion concerned only the academic problem of selecting the most apt of the three possible modalities. Judge Groton specifically was contrasting subsection (a)(1) with subsection (a)(2).

Subsection (a)(1) – "by force, or the threat of force, without consent of the other" – deals with an act of sexual intercourse committed on a victim who is both conscious and competent. Such a victim must make a choice: "Yes, I will" or "No, I won't." The very reason that the elements of "force" or "threat of force" are a part of (a)(1), but not a part of (a)(2) or (a)(3), is that in the case of a conscious and competent victim, mere passivity on the victim's part will not establish the absence of consent. The law looks for express negation or implicit negation as evidenced by some degree of physical resistance or an explanation of why the will to resist was overcome by force or fear of harm. That is the lesson of such cases as Hazel v. State, 221 Md. 464, 157 A.2d 922 (1960), and State v. Rusk, 289 Md. 230, 424 A.2d 720 (1981). The entire factual controversy over degree of

resistance is something that arises under (a)(1) but that the court does not have to bother with under (a)(2).

When (a)(2) or (a)(3) deal with legally incompetent or unconscious victims, on the other hand, the lack of consent does not have to be established independently by showing either resistance or fear of resistance but is automatically established, as a matter of law, by the status of the victim. This is a significant evidentiary difference when the prosecutor sets out to prove a case of rape. Must the lack of consent be proved independently or has it already been proved automatically by virtue of the State's having proved something else which is the equivalent of lack of consent?

Under (a)(2), in contrast to (a)(1), a victim who is "mentally defective," "mentally incapacitated," or "physically helpless" need not establish the lack of consent by resisting. To that not insignificant extent, (a)(2), indeed, has "nothing to do with consent." The proof of lack of consent has not been obviated; it has rather been finessed. This is all that Judge Groton was talking about with his six-word observation. He was referring to independent proof of lack of consent required under (a)(1) but not required under (a)(2). Under (a)(2), one does not have to prove the absence of consent independently because it has already been proved automatically. The three classes of victim dealt with in (a)(2) are incapable of consenting. They, therefore, do not have to resist. Under (a)(1) the proof of lack of consent must be factually ad hoc; under (a)(2) it is categorical. That is a significant difference. The State is relieved from having to prove directly what it has already proved indirectly. Unlike

- 17 -

the appellant, we do not look at the six-word phrase he obsesses over in a vacuum. We look at the obvious intendment of those words in full context. We hold that the Due Process Clause has not been undermined and the convictions need not be reversed because of any failure of proof of the lack of consent.

## A Reflection

As we emerge from what seems to have been more of a Platonic dialogue than a measurement of legal sufficiency, it occurs to us that we have been presiding over a furious battle over nothing but the choice of words. Appellant's counsel and the trial court at times used the same words, but in different ways, and they ended up talking across each other. The problem was with how they talked about the "lack of consent." In its simplest conceptualization, it is a binary or dualistic choice between "Yes, I will" or "No, I won't." The proof of such a simple choice is subject to the normal vicissitudes of production and persuasion. The complicating factor, of course, is that the lack of consent embraces not only the obvious negative choice but the more elusive and less obvious failure to choose, in the case of rape, because of the inability or incompetence to choose. This latter aspect of lack of consent is proved in a very different way, automatically by virtue of having proved something else.

When the judge said that subsection (a)(2) did not involve the lack of consent, he meant only that proof under (a)(2) did not involve a factual issue of the victim making a binary choice between "Yes, I will" and "No, I won't." Lack of consent may mean not only

a negative response but also a non-response, and the two are proved in different ways. Under (a)(2) consent does not have to be proved independently because it is implicit in the (a)(2) conditions.

Defense counsel now argues, however, that the judge erroneously ruled that the crime of rape does not have as one of its elements the absence of consent. In reality, the two were simply using the same words to mean different things, one of them referring to the very existence of non-consent while the other was referring only to the method of proving non-consent. It confirms our long-standing belief that a large percentage of legal problems are simply linguistic problems.

## Extending the Rationale

The appellant has actually raised this contention charging that the trial judge erroneously failed to appreciate the need for a finding of lack of consent and, therefore, erroneously failed to find the lack of consent with respect to the second-degree sexual offense and the third-degree sexual offense as well as with respect to the second-degree rape. Our answer to the contention in these broader applications, as well as our analysis arriving at our answer, is exactly the same in the cases of a second-degree sexual offense and a third-degree sexual offense as it is in the case of second-degree rape.

Just as second-degree rape distinguishes between the conscious and competent victim in § 3-304(a)(1), where lack of consent had to be established as a matter of fact, and the unconscious or legally incompetent victim in § 3-304(a)(2), where proof of the very status

of the victim establishes lack of consent as a matter of law, a second-degree sexual offense makes the same verbatim distinction as it distinguishes § 3-306(a)(1) from § 3-306(a)(2). The only distinction between the two crimes is the distinction between a "sexual act" and "vaginal intercourse." Their respective modalities for finding non-consent are the same.

In not quite so verbatim terms, a third-degree sexual offense distinguishes between the conscious and competent victim in § 3-307(a)(1) and the unconscious or legally incompetent victim in § 3-307(a)(2). Only in the first case must the lack of consent be directly proved as a matter of fact. In the second case, lack of consent is once again necessarily implicit in the very status of the victim. It does not have to be proved directly not because it is not required but only because it is implicit in the victim's condition.

### A Sleeping Victim Is A Non-Consenting Victim

As the best explanation of why a sleeping victim is necessarily a rape victim, Judge Groton settled on § 3-304(a)(2) and, within that subsection, on a "physically helpless individual." Section 3-301(d) defines such a victim.

> (d) *Physically helpless individual*. – "Physically helpless individual" means an individual who:
>
> (1) is unconscious; or
>
> (2)(i) does not consent to vaginal intercourse, a sexual act, or sexual contact; and
>
> (ii) is physically unable to resist, or communicate unwillingness to submit to, vaginal intercourse, a sexual act, or sexual contact.

(Emphasis supplied).

- 20 -

The common law of rape has long recognized that engaging in sexual intercourse with a woman who is asleep is a form of rape. In Lewis Hochheimer, Crimes And Criminal Procedures, § 429 "Rape," p. 456 (2d ed. 1904), it is said:

> Carnal knowledge of a woman is said to be by force and against her consent, if, to the knowledge of the accused, she was in such an imbecile or idiotic state of mind, or so drunken, or unconscious from sleep, or affected by drugs, as to be unable to assent.

(Emphasis supplied).

In 3 Wharton's Criminal Law, § 289 "Incapacity to Consent," p. 38 (Charles E. Torcia, ed., 14th ed. 1980), it is similarly stated:

> A female is obviously incapable of consenting to sexual intercourse when she is unconscious or asleep.

(Emphasis supplied).

Although dealing with incompetence due to drunkenness rather than to being asleep, this Court did hold in Crawford v. State, 36 Md. App. 393, 400, 373 A.2d 984 (1977):

> It is well settled that unlawful sexual intercourse with a female person without her consent constitutes the common-law felony of rape. It is also settled that unlawful sexual intercourse with a woman who is incapable of giving or withholding consent is rape.

(Emphasis supplied).

With respect to the absence of consent by a sleeping victim, the national case law is in essential agreement. King v. State, 978 P.2d 1278, 1280 (Alaska App. 1999); Harvey v. State, 14 S.W. 645, 646 (Ark. 1890); Davis v. State, 538 So. 2d 515, 516 (Fla. App. 1989); Brown v. State, 331 S.E.2d 891, 913 (Ga. App. 1985) ("sexual intercourse with a woman

- 21 -

whose will is temporarily lost from intoxication, or unconsciousness arising from use of drugs or other cause, or sleep, is rape"); Boone v. Commonwealth, 155 S.W.3d 727, 731 (Ky. App. 2004) ("Although sleep may not always be a fully unconscious condition, '[i]t is axiomatic that sleep is the antithesis of awareness. It is that periodic state of rest in which consciousness is suspended. Whether induced by drug, or achieved by normal processes, being in the state of sleep renders one unable to make a conscious choice.'"); People v. Perry, 432 N.W.2d 377, 382 (Mich. 1988); State v. Welch, 89 S.W. 945, 947 (Mo. 1905); State v. Rush, 650 A.2d 373, 375-76 (N.J. App. 1994) ("[A] person who is actually asleep is incapable of fleeing or communicating unwillingness to act."); State v. Moorman, 358 S.E.2d 502, 505 (N.C. 1987) ("a sleeping person is a physically helpless person"); In re Childers, 310 P.2d 776, 777 (Okla. Cr. 1957) ("[A] person who is unconscious by reason of intoxication, drugs, or sleep, is incapable of exercising any judgment in any means whatsoever."); State v. Puapuaga, 776 P.2d 170, 172 (Wash. App. 1989) ("The state of sleep seems to be universally understood as unconsciousness or physical inability to communicate unwillingness.").

## Sleep As A Variety Of Unconsciousness

The appellant seeks to parry § 3-301(d)'s definition of a "physically helpless individual" as "an individual who is unconscious" by pointing to an arguably hypertechnical distinction between unconsciousness and sleep. As far as the absence of consent that is implied in the case of a victim who is unable to choose between consenting and not

consenting, however, it is a distinction without a difference. Unconsciousness is a broader category than sleep, but it includes sleep. One might well be unconscious for reasons other than being asleep: a brain tumor, a severe concussion, extreme intoxication, anesthesia, narcolepsy, or a fainting spell. The broader category nonetheless includes the state of being asleep. For the appellant to assert that all who are unconscious are not asleep by no means yields his desired conclusion that all who are asleep are not unconscious. A sleeping victim is not excluded from § 3-301(d)'s definition of a "physically helpless individual."

In his reply brief, the appellant attempts to draw a critical distinction between unconsciousness and sleep.

> The State's attempt, on appeal, to equate being asleep with being unconscious fails to acknowledge a significant difference between the two. <u>A person who is unconscious is unable to respond to stimuli like sound or touch such as being shaken; a person who is asleep will respond to such sensory stimuli.</u> See, e.g., http://nlm.nih.gov/medlineplus/ency/article/000022.htm ("Being asleep is not the same thing as being unconscious. <u>A sleeping person will respond to loud noises or gentle shaking – an unconscious person will not."</u>). A person who is unconscious cannot consent; a person who is asleep can wake up and consent.

(Emphasis supplied).

Section 3-304(a)(2)'s protection of one who is a "physically helpless individual" by virtue of being "unconscious" applies to all forms of unconsciousness, including sleep. The critical common denominator is that such an individual is unaware of what is then happening or is about to happen sexually. Such an individual, while in that state of unconsciousness, is unable to make a choice between consenting and not consenting. To draw a meaningless

distinction between how difficult or easy it might be to rouse the victim from the state of unconsciousness after the criminal sexual violation had already occurred is beside the point. The critical moment of consent <u>vel</u> <u>non</u> occurs before the victim is awake, not afterward.

To say, as the appellant does, that one who is merely asleep, as opposed to one who might be unconscious for other reasons, can more easily "wake up and consent" has no remote pertinence to anything we have been talking about. What matters is that one cannot consent before waking up. Being asleep qualifies as an instance of being unconscious.

## Were the Verdicts Inconsistent?

In this non-jury trial, Judge Groton rendered five verdicts, four of guilty and one of not guilty. In his second contention, the appellant claims that the mixed verdicts of guilty and not guilty were fatally inconsistent.

The appellant was convicted of second-degree rape. In the most simplistic terms, that is an act of vaginal intercourse with a woman without her consent. The appellant was, secondly, convicted of a second-degree sexual offense. In simplistic terms, that is a sexual act (in this case, fellatio), without the victim's consent. The appellant was, thirdly, convicted of a third-degree sexual offense. Simplistically, that is sexual contact with another person without that person's consent. The absence of consent, in various permutations, was a factor in all three of those crimes.[1]

------

[1] The appellant was also convicted of second-degree assault. We conveniently put to the side the inconsistency contention with respect to the conviction for second-degree
(continued...)

The appellant was, by contrast, acquitted of a sexual offense in the fourth degree. In simplistic terms, that is sexual contact with another without that person's consent. The appellant contends that the acquittal of the fourth-degree sexual offense necessarily established that the State had failed to prove the absence of consent on the part of the victim and that such a finding by the trial judge was incompatible with the three convictions, in each of which the absence of consent was a necessary element.

As we address this claim of verdict inconsistency, some legal background is necessary to establish an intelligible context.

## A Mere Secondary Contention of Awesome Complexity

Although a vexing problem throughout the common law world, inconsistency between verdicts is not a matter of constitutional dimension. United States v. Powell, 468 U.S. 57, 65, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984); Harris v. Rivera, 454 U.S. 339, 344-48, 102 S. Ct. 640, 70 L. Ed. 2d 530 (1981). At least since 1932, however, the overwhelming majority of American states has followed the lead of the Supreme Court.[2]

There is a wide variety of possible inconsistencies. There is the relatively rare problem of an inconsistency between two convictions. There is the far more prevalent

---

[1](...continued)
assault. We are content to declare ex cathedra that a conviction for second-degree assault and an acquittal for a fourth-degree sexual offense are not fatally inconsistent verdicts.

[2]Eric L. Muller, "The Hobgoblin of Little Minds? Our Foolish Law of Inconsistent Verdicts," 111 Harv. L. Rev. 771, 787 n.80 (1998), lists 38 states as following the federal lead.

problem of an inconsistency between a conviction and an acquittal. There may be an inconsistency between verdicts on different counts in the same indictment or on different indictments against a single defendant in a single trial. Although a rarer occurrence in the case law, there may be inconsistent verdicts against different co-defendants in a trial against multiple defendants. There is a vast difference between inconsistent verdicts rendered by a judge in a non-jury trial and inconsistent verdicts rendered by a jury. There is also the little explored rarity of inconsistency between one verdict rendered by a jury and another verdict rendered by a judge in a mixed judge/jury trial. See, for instance, Galloway v. State, 371 Md. 379, 401, 809 A.2d 653 (2002). There is a significant difference (not touched on in this opinion) between inconsistent verdicts in civil trials and inconsistent verdicts in criminal trials. There is also a difference enjoying more recent attention between what, in Maryland at least, is referred to as legal inconsistency and what is referred to as factual inconsistency. In short, inconsistency between verdicts is by no means a simple or one-dimensional problem. It is a collection of what can be very different problems.

## "An Ounce of Prevention ..."

When the State unexpectedly loses a hard earned victory at the eleventh hour, the most wasteful and the most unnecessary cause is that of inconsistency between the verdicts. In the flush of apparent success at the end of a trial, it is all too easy to allow impatience and untidiness to compromise the mopping up operation. Although lesser charges may seem to be little more than superfluous clutter, every "i" must carefully be dotted and every "t" must

carefully be crossed before the victory celebration is permitted to begin. Following a conviction for a greater inclusive offense, e.g., not guilty verdicts should never be rendered on lesser included offenses simply to clear the deck. If, as Emerson tells us, "a foolish consistency is the hobgoblin of little minds," a careless inconsistency is the hobgoblin of impatient minds.

## A Common Law Provenance

The legal rules and precepts for handling inconsistent verdicts in Maryland, as well as nationally, are of common law origin. There are neither statutes nor rules of court governing the subject. It is all a matter of slowly evolving case law. In <u>Price v. State</u>, 405 Md. 10, 18, 949 A.2d 619 (2008), Judge Eldridge discussed the source of Maryland's inconsistent verdict law:

> In Maryland, <u>the principles</u> concerning inconsistent verdicts <u>have judicially developed over time as part of this State's common law.</u> Unlike several other jurisdictions, <u>there are no Maryland statutes or promulgated procedural rules which relate to inconsistent verdicts</u> generally or relate to specific types of inconsistent verdicts. Moreover, the Maryland common law principles governing inconsistent verdicts are themselves confusing and somewhat inconsistent.

(Emphasis supplied).

Over the years, however, Maryland did to a significant extent follow the lead of the Supreme Court as inconsistent verdict law has been evolving.

- 27 -

**Inconsistent Verdicts of Conviction**

As this Court noted in <u>Tate v. State</u>, 176 Md. App. 365, 382, 933 A.2d 447 (2007) ("<u>Tate I</u>"), remanded for reconsideration in light of <u>Price v. State</u>, 405 Md. 10, 949 A.2d 619 (2008), but reaffirmed by <u>Tate v. State</u>, 182 Md. App. 114, 957 A.2d 640, <u>cert. denied</u>, 406 Md. 747 (2008) ("<u>Tate II</u>"), "Traditionally, a distinction has always been made between 1) two inconsistent convictions and 2) a conviction and an inconsistent acquittal." The relatively rare problem of inconsistent convictions, whether emanating from a jury alone or from a judge alone or from a combination of the two, is a self-contained phenomenon that may here be quickly noted and conveniently set to one side. Even to discuss inconsistency between convictions when dealing with the very different problem of an inconsistency between a conviction and an acquittal is to compare apples with oranges, a practice sedulously to be avoided.

Inconsistency between convictions has always been recognized as an error that calls for some sort of correction. In now fashionable Maryland terms, moreover, it is a legal inconsistency rather than a less virulent factual inconsistency. It occurs when, in a single trial, one of the convictions necessarily establishes an element which is incompatible with an element necessary to the other conviction. The two contradictory elements cannot co-exist.

A classic example of inconsistent convictions is the early Maryland case of <u>Heinze v. State</u>, 184 Md. 613, 42 A.2d 128 (1945). Each of two defendants was charged with both

the larceny of $20 and receiving $20 of stolen goods. Notwithstanding an ultimately

unsuccessful effort by the clerk of the court to correct the jury's verdict, the actual verdict

rendered by the jury foreman was that each defendant was guilty on both counts. In the days

before Maryland's 1978 Consolidated Theft Law, however, a defendant could not for the

same act be both a thief and a receiver of stolen goods. Although ultimately finding that the

defendants, under the special circumstances of the case, had suffered no prejudice, the

statement of the Court of Appeals was clear as to the legal incompatibility of the two such

guilty verdicts.

> It is unquestioned that a finding of guilty on two inconsistent counts is invalid.
> Thus, where a defendant is charged in one count with larceny and in another
> count with receiving stolen goods, and it plainly appears that the property
> alleged to have been stolen is that also alleged to have been received, a
> general verdict of guilty is fatally defective, because in law a thief cannot be
> guilty of the crime of receiving stolen goods which he himself has stolen, and
> a guilty receiver of stolen goods cannot himself be the thief, and hence the
> defendant could not be guilty on both counts.

184 Md. at 617 (emphasis supplied). See also Shell v. State, 307 Md. 46, 55, 512 A.2d 358

(1986); Mack v. State, 300 Md. 583, 601, 479 A.2d 1344 (1984); Henry v. State, 273 Md.

131, 137-38, 328 A.2d 293 (1974); Johnson v. State, 238 Md. 528, 541, 209 A.2d 765

(1965); Tucker v. State, 237 Md. 422, 425, 206 A.2d 691 (1965); Fabian v. State, 235 Md.

306, 313-14, 201 A.2d 511 (1964); Fletcher v. State, 231 Md. 190, 193, 189 A.2d 641

(1963); Young v. State, 220 Md. 95, 100, 151 A.2d 140 (1959); Leet v. State, 203 Md. 285,

293, 100 A.2d 789 (1953); Tate I, 176 Md. App. at 382; Jenkins v. State, 59 Md. App. 612,

618, 477 A.2d 791 (1984).

Unlike an inconsistency between a conviction and an acquittal, an inconsistency between convictions does not automatically call for a reversal. In Tate I, 176 Md. App. at 383, this Court explained the possibly non-fatal consequences of such an inconsistency.

> Even in the case of two inconsistent convictions, however, neither of the verdicts will be disturbed on appeal if 1) the defendant failed to make timely objection to the inconsistency at the time the verdicts were rendered and 2) no real prejudice can be shown, to wit, something more than simply an inconsistency in the abstract. Because the prejudice possibly arising out of inconsistent convictions would consist of either multiple sentences or an excessive sentence on one of the convictions, no real prejudice would result if 1) only a single sentence were imposed and 2) that sentence was within the range of sentencing available for the lesser of the two convictions. Hardesty v. State, 223 Md. 559, 562, 165 A.2d 761 (1960); Bell v. State, 220 Md. 75, 80-81, 150 A.2d 908 (1959); Novak v. State, 139 Md. 538, 115 A. 853 (1921); Dickens v. State, 175 Md. App. 231, 243-45, 927 A.2d 32 (2007)[; Jenkins v. State, 59 Md. App. 612, 621-22, 477 A.2d 791 (1984)].

(Emphasis supplied).

At this point in our larger analysis we have paused to look at inconsistent convictions in order to make the point that verdict inconsistency is a variegated subject and not an undifferentiated whole. Caution should be employed, therefore, not to draw glib or inapt analogies between phenomena that are not analogous. Inconsistency between convictions is a subject unto itself. As was pointed out by Tate I, 176 Md. App. at 384-85:

> There is an almost unbridgeable divide between the case of an inconsistency between two convictions (by judge or jury), on the one hand, and an inconsistency between a jury's conviction and a jury's acquittal, on the other hand. In the case of inconsistent convictions, the fact finder has necessarily and affirmatively found two things that are unquestionably irreconcilable. There is nothing to speculate about, and such an incongruous result is flatly prohibited. As the caselaw has been pointing out for 75 years, however, there are a number of plausible explanations for an apparently

- 30 -

inconsistent acquittal by a jury and the law does not mandate a reversal based on mere speculation as to what the actual explanation may have been.  In the one case, appellate review is rigid. In the other case, it is extremely indulgent.

These two species of inconsistency are so inherently different that doctrinal cross-fertilization is problematic in the extreme.  Statements made in the context of inconsistent conviction cases may have no applicability at all in the very different world of an inconsistency between a jury's conviction and a jury's acquittal.  Pronouncements quite correctly made in the first context can be treacherous if uncritically misapplied in the second.  Such a doctrinal transplant does not always take.

(Emphasis supplied).

## Inconsistency Between A Conviction And An Acquittal

It is the inconsistency between a verdict of conviction and, on another count or indictment against the same defendant, a verdict of acquittal that has commanded the lion's share of attention.  It is in this area that we draw a distinction between the sources of the inconsistent verdicts.  Was the source a jury?  Was the source a judge in a non-jury trial?  Or was the source a combination of the two in a mixed trial scenario?  That third possibility we can dispose of briefly.

## A Mixed Verdict By Judge and Jury

The law has traditionally been far more tolerant of inconsistent verdicts handed down by a jury than of similar inconsistency at the hands of a judge alone.  For all intents and purposes, inconsistent verdicts rendered by the combination of judge and jury are held to the same rigorous standard as that regulating inconsistent verdicts rendered by the judge alone.  Just as the judge is required to make his verdicts logically consistent with each other, the

judge is similarly required, in a mixed trial scenario, to make his verdict conform to whatever verdict the jury has rendered. The obligation to be consistent is a one-way street.

The 4-3 decision of the Court of Appeals in Galloway v. State, 371 Md. 379, 809 A.2d 653 (2002), is a case in point. It also illustrates why a mixed trial modality is sometimes necessary, or at least desirable. Galloway was charged in a nine-count indictment. Counts one through seven charged a number of substantive offenses. Counts eight and nine charged the possession of a firearm after having been convicted previously of a crime. Galloway expressed concern over the possible prejudicial impact on the jury of his prior criminal record, a necessary element of counts eight and nine, on the remaining seven charges. With the acquiescence of Galloway, the trial judge determined that the jury would hear evidence on and would consider only the first seven counts. The trial judge, out of the presence of the jury, would hear the evidence about the prior criminal record and would then render her own verdict on counts eight and nine.

The surprise came at verdict time as the jury returned verdicts of not guilty on counts one through seven even as the judge found Galloway guilty on counts eight and nine. Galloway appealed those convictions on the ground that his convictions by the judge for possessing a firearm while having a criminal record were inconsistent with his acquittal by the jury on count seven on the charge of carrying a handgun. There was no question that the firearm at issue in counts eight and nine was a handgun.

Judge Cathell's opinion for the Court of Appeals had no difficulty in finding an inconsistency.

> [T]here is no dispute as to whether the verdicts were inconsistent. <u>They are clearly inconsistent.</u> At a given point in time, <u>the jury held that appellant did not possess the handgun.</u> <u>The trial court necessarily held that</u>, at the same given point in time, <u>appellant</u>, a felon, <u>was in possession of the same handgun.</u>

371 Md. at 400 (emphasis supplied). The holding of the Court of Appeals was clear.

> It makes no difference in criminal cases what the procedure is that results in the mingling of court and jury verdicts; <u>inconsistent verdicts</u> based on identical facts, <u>are not permitted unless the inconsistency is solely a jury inconsistency.</u>

371 Md. at 401 (emphasis supplied).

Where the court is involved in any way, either in verdicts rendered by the court alone or in the combined verdicts of court and jury, inconsistent verdicts will not be permitted.

> Maryland's appellate courts have disapproved inconsistent verdicts in criminal cases <u>where the inconsistency involved court action.</u>

371 Md. at 400 (emphasis supplied).

With inconsistent verdicts by a judge and jury combined being subsumed into inconsistent verdicts rendered by a judge alone, the total picture becomes a bit less cluttered. We are dealing with either 1) inconsistency by a jury or 2) inconsistency charged to a judge.

### Inconsistent Verdicts Of Guilty And Not Guilty By A Jury

The developing law with respect to inconsistency between verdicts has been predominantly, indeed almost exclusively, concerned with a conviction and an inconsistent

acquittal at the hands of a jury.[3]  The starting point was a generally recognized common law principle that inconsistent verdicts would not be permitted.  The entire subject of inconsistent verdicts first achieved national prominence in 1925 as federal courts, soon followed by state courts, carved out a massive exception to the former prohibition for an inconsistency between a conviction and an acquittal both rendered by a jury.  Instead of being strictly forbidden, inconsistency at the hands of a jury became almost universally tolerated.

Contrary to popular understanding, the pioneering opinion was not that of Justice Holmes in Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356, in 1932, but that of Judge Learned Hand[4] for the Second Circuit Court of Appeals in Steckler v. United States, 7 F.2d 59, in 1925.  The Second Circuit was confronted with an undeniable inconsistency in the jury's verdicts.

_____

[3]As was noted by Alexander M. Bickel, Comment, "Judge and Jury – Inconsistent Verdicts in the Federal Courts," 63 Harv. L. Rev. 649, 653 (1950):

[T]he possibility of inconsistent verdicts increases in direct ratio to the number of counts.

Steven T. Wax, "Inconsistent and Repugnant Verdicts In Criminal Trials," 24 N.Y.L. Sch. L. Rev. 713, 729 (1979), also observes:

[C]urtailment of the prosecution's practice of incorporating into indictments every possible crime which can be developed from a given set of facts would reduce the potential for verdict inconsistency.

[4]For decades, Learned Hand was recognized as one of the most creative legal scholars in America.  He was regularly, albeit informally, referred to as "the tenth justice."

There is a plain inconsistency in saying that the liquors were kept for sale, and in saying that the shop in which they were was not one in which the same liquors were kept for sale. We cannot, therefore, avoid the question whether this inconsistency invalidated the verdict of guilty on count 2.

7 F.2d at 60 (emphasis supplied). Judge Hand recognized, moreover, that the court was plowing new ground.

> No doubt it has generally been assumed that, if the verdict was rationally inconsistent, the conviction ought not to stand, and probably that was the common law, though it is hard to find a case squarely so holding.

Id. (emphasis supplied).

Judge Hand explained that the pertinent question in cases in which inconsistent verdicts of guilty and not guilty are returned is whether, with respect to the guilty verdict, the jury was truly persuaded of the defendant's guilt. Because the acquittal on one charge may well have been based upon a desire to guarantee lenity or upon a compromise to achieve jury unanimity, the not guilty verdicts do not cast sufficient doubt upon the jury's return of the guilty verdict to justify overturning it on mere speculation.

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.
>
> That the conviction may have been the result of some compromise is, of course, possible; but to consider so is to consider too curiously, unless all verdicts are to be upset on speculation. That it represented their deliberate judgment seems to us beyond any reasonable doubt.

Id. (emphasis supplied).

- 35 -

It was seven years later that Justice Holmes bestowed the blessing of the Supreme Court on Steckler with his much heralded opinion in Dunn v. United States, supra. It was Dunn that gave the tolerance of jury inconsistency the prominence it has enjoyed for the last eighty-two years. A jury had convicted Dunn of maintaining a common nuisance by keeping intoxicating liquor for sale at a specified place. The same jury, however, had also acquitted Dunn of both 1) the unlawful possession of the intoxicating liquor and 2) the unlawful sale of said liquor. Dunn contended that the conviction could not stand in light of the inconsistent acquittals. Justice Holmes's opinion was brief but certain.

> Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.

284 U.S. at 393 (emphasis supplied). After quoting with approval from Judge Hand's opinion in Steckler, Justice Holmes concluded:

> That the verdict may have been the result of compromise, or of a mistake on the part of the jury, is possible. But verdicts cannot be upset by speculation or inquiry into such matters.

284 U.S. at 394.

Lest any suspect that Dunn v. United States is now somehow superannuated, the 1984 opinion of a unanimous Supreme Court in United States v. Powell, 469 U.S. 57, 105 S. Ct.

- 36 -

471, 83 L. Ed. 2d 461, was a rousing re-endorsement.  Chief Justice Rehnquist's opinion for

the Court noted:

> Fifty-three years later <u>most of what Justice Holmes so succinctly stated
> retains its force.</u>  Indeed, although not expressly reaffirming <u>Dunn</u> <u>this Court
> has on numerous occasions alluded to its rule as an established principle.</u>
> [The Court cited and briefly discussed <u>United States v. Dotterweich</u>, 320 U.S.
> 277, 279, 64 S. Ct. 134, 135, 88 L. Ed. 48 (1943), and <u>Harris v. Rivera</u>, 454
> U.S. 339, 102 S. Ct. 460, 70 L. Ed.2d 530 (1981).]
>
> These decisions indicate that this is not a case where a once-established
> principle has gradually been eroded by subsequent opinions of this Court.

469 U.S. at 63 (emphasis supplied).

The Court's opinion explained why inconsistent jury verdicts of conviction and

acquittal are tolerated.

> <u>The rule that the defendant may not upset such a verdict embodies a prudent
> acknowledgment of a number of factors.</u>  First, as the above quote suggests,
> inconsistent verdicts – even verdicts that acquit on a predicate offense while
> convicting on the compound offense – should not necessarily be interpreted
> as a windfall to the Government at the defendant's expense.  <u>It is equally
> possible that the jury, convinced of guilt, properly reached its conclusion on
> the compound offense, and then through mistake, compromise, or lenity,
> arrived at an inconsistent conclusion on the lesser offense.</u>  But in such
> situations the Government has no recourse if it wishes to correct the jury's
> error; the Government is precluded from appealing or otherwise upsetting
> such an acquittal by the Constitution's Double Jeopardy Clause.

469 U.S. at 65 (emphasis supplied).  The opinion explained that lenity is frequently the

explanation for a jury's apparent inconsistency.

> <u>Dunn</u> has been explained by both courts and commentators as <u>a recognition
> of the jury's historic function, in criminal trials, as a check against arbitrary or
> oppressive exercises of power by the Executive Branch.</u>

- 37 -

... The fact that the inconsistency may be the result of lenity, coupled with the Government's inability to invoke review, suggests that inconsistent verdicts should not be reviewable.

469 U.S. at 65-66 (emphasis supplied). As we earlier noted, the Dunn-Steckler acceptance of jury inconsistency has been followed by thirty-eight states.[5]

From the first occasion on which it addressed the question of an inconsistency between a jury conviction and a jury acquittal, Maryland regularly endorsed the rule of Dunn. In Leet v. State, 203 Md. 285, 293, 100 A.2d 789 (1953), Chief Judge Sobeloff quoted with approval from both Dunn and Steckler. The conclusion of the Court of Appeals was brief but sure.

If we nevertheless assume that there was an inconsistency, the result is not necessarily to reverse the conviction. While it is true that a finding of guilt on two inconsistent counts will be declared invalid in Maryland, it does not

_____

[5] Alexander M. Bickel, Comment, "Judge and Jury – Inconsistent Verdicts in the Federal Courts," 63 Harv. L. Rev. 649, 651-52 (1950), offered a good explanation of why jury inconsistency in pursuit of lenity is widely tolerated by the courts:

The law states duties and liabilities in black and white terms. Human actions are frequently not as clean-cut. Judges themselves sometimes undertake, in sentencing, the search for a middle ground between the absolutes of conviction and acquittal. To deny the jury a share in this endeavor is to deny the essence of the jury's function, which is finding a solution for those occasional hard cases in which "law and justice do not coincide." Dunn reaffirms the jury's power to exercise leniency by limiting punishment to sentence upon only one of many counts – even though in recognizing this power the Court alluded to it as one to which the jury has no "right."

(Emphasis supplied).

- 38 -

> follow that a conviction on one count may not stand because of an inconsistent acquittal on another count.

(Emphasis supplied).

For the next fifty-five years, Maryland continued to follow <u>Dunn v. United States</u>. <u>Williams v. State</u>, 204 Md. 55, 64, 102 A.2d 714 (1954); <u>Ledbetter v. State</u>, 224 Md. 271, 273-74, 167 A.2d 596 (1961); <u>Ford v. State</u>, 274 Md. 546, 552-53, 337 A.2d 81 (1975); <u>Mack v. State</u>, 300 Md. 583, 597, 479 A.2d 1344 (1984); <u>Hudson v. State</u>, 152 Md. App. 488, 513, 832 A.2d 834 (2003); <u>Price v. State</u>, 172 Md. App. 363, 388-90, 915 A.2d 432 (2007), <u>rev'd</u>, 405 Md. 10, 949 A.2d 619 (2008).

## Maryland Changes Course

For Marylanders a sea change occurred in 2008. In <u>Price v. State</u>, 172 Md. App. 363, 915 A.2d 432 (2007), the Court of Special Appeals had continued to follow the <u>Stecker</u>-<u>Dunn</u>-<u>Powell</u> tolerance of inconsistency between verdicts of conviction and acquittal in a jury trial, the position that Maryland had consistently taken since <u>Leet v. State</u>, <u>supra</u>, in 1953. In its <u>Price v. State</u>, 405 Md. 10, 949 A.2d 619 (2008) (hereinafter "<u>Price</u>"), the Court of Appeals reversed course and held that inconsistent verdicts of conviction and acquittal will no longer be tolerated in jury trials.

Judge Eldridge's opinion for the <u>Price</u> majority pointed out that consistency has always been demanded between verdicts rendered by a judge alone. <u>State v. Williams</u>, 397 Md. 172, 189-90, 916 A.2d 294 (2007). The opinion further pointed out that consistency had similarly been demanded between a verdict rendered by a jury and a verdict rendered

by a judge in a hybrid judge/jury trial. Galloway v. State, 371 Md. at 401. Although referring to a totally different phenomenon and not to an inconsistency between a conviction and an acquittal, the Price opinion also noted that consistency has regularly been demanded between verdicts of conviction. Shell v. State, 307 Md. 46, 55, 512 A.2d 358 (1986). The opinion concluded by observing that consistency is now demanded between verdicts (by judge or jury) in civil cases. Southern Management v. Taha, 378 Md. 461, 467, 836 A.2d 627 (2003).

Price's thesis was that consistency law itself should at least aspire to consistency. Accordingly, it did, as Maryland joined Alaska[6] and Florida[7] in seeming to reject totally the Steckler-Dunn-Powell rationale as to why jury inconsistency should be tolerated (actually, Price did not effect a total rejection of that tolerance, as we shall examine, infra). The majority opinion's conclusion in Price appeared to be a sweeping one.

> Accordingly, with regard to the instant case, similarly situated cases on direct appeal where the issue was preserved, and verdicts in criminal jury trials rendered after the date of our opinion in this case, inconsistent verdicts shall no longer be allowed.

405 Md. at 29 (emphasis supplied).

Interestingly, the Price majority opinion neither mentioned nor recognized any possible distinction between legal inconsistency and factual inconsistency. Neither did it mention any requirement with respect to preservation of the issue for appellate review. In

---

[6]DeSacia v. State, 469 P.2d 369 (Alaska 1970).

[7]Naumowicz v. State, 562 So. 2d 710 (Fla. Dist. Ct. App. 1990).

short order, it became clear that the major significance of the Price decision lay in the concurring opinion of Judge Harrell. That concurrence began by noting, "The Majority opinion ... does not penetrate further into the jurisprudential wilderness." 405 Md. at 35. Where the majority opinion did not penetrate, however, the concurring opinion did.

## Legal Versus Factual Inconsistency

In the universe of inconsistent verdicts, the percentage of factually inconsistent verdicts is far greater than is the percentage of legally inconsistent verdicts. As far as the prosecution is concerned, the opening words of Judge Harrell's concurrence removed 75-80% of Price's sting.

> I think it important to note explicitly that the Majority's holding applies only to "legally inconsistent" verdicts, not "factually inconsistent" verdicts. The Court should continue to recognize factually or "logically" inconsistent verdicts rendered by juries in criminal cases.

405 Md. at 35 (emphasis supplied).

The intolerance of jury inconsistency commanded by Price would, should the concurrence prevail, apply to a relatively small fraction of jury inconsistencies. A lion's share of the Steckler-Dunn-Powell tolerance of jury inconsistencies, therefore, would still abide.

The distinction between legal inconsistency and factual inconsistency, moreover, is essentially a new entry in the legal lexicon. One can apply the new distinction to the older cases, in state and out, and distinguish legal inconsistencies from factual ones, but the older cases did not consciously and articulately apply these characterizing tags. The academic

- 41 -

literature, moreover, is also almost completely silent as to the legal-factual distinction which

has now become a critical criterion in Maryland.[8]

The difficulty is that although the respective heartlands can be cleanly distinguished

from each other, the borderline between legal inconsistency and factual inconsistency is

often a blurred boundary. The concurring opinion offered the following distinction:

> A factually inconsistent verdict is one where a jury renders "different verdicts on crimes with distinct elements when there was only one set of proof at a given trial, which makes the verdict illogical." The feature distinguishing a factually inconsistent verdict from a legally inconsistent verdict is that a factually inconsistent verdict is merely illogical.

405 Md. at 35 (emphasis supplied). The concurring opinion also offered an illustrative

example:

> Assume a legally intoxicated or otherwise reckless driver causes a head-on collision, killing on impact the driver and passenger of the other car. The intoxicated driver is charged with two counts of vehicular homicide. The jury convicts the defendant of vehicular homicide as to the death of the driver of the other car, but finds the defendant not guilty of the same crime with regard to the death of the passenger. Such a result would constitute factually inconsistent verdicts.

405 Md. at 35-36 (emphasis supplied).

---

[8]The Maryland dichotomy between factually inconsistent and legally inconsistent verdicts has as its linguistic counterpart, in New York at least, the dichotomy between "inconsistent" and "repugnant" verdicts. See Steven T. Wax, "Inconsistent and Repugnant Verdicts in Criminal Trials," 24 N.Y.L. Sch. L. Rev. 713 (1979). Actually, the more precise New York dichotomy is one between "mere inconsistency" and "inconsistency amounting to repugnancy."

Mere logical inconsistency is only factual inconsistency and will not condemn a jury's

verdicts as fatally inconsistent.

> The verdicts in the present case also contain a factual inconsistency.
> Price was acquitted of being a felon in possession of a handgun, but convicted
> of possessing a handgun in the course of drug trafficking. There was no
> dispute at trial as to Price's prior felony convictions. Therefore, <u>it is illogical
> for the jury to find that Price is guilty of possessing a firearm in the course of
> drug trafficking without possessing a firearm as a convicted felon. Despite
> the illogical verdict, this does not rise to the level of a legally inconsistent
> verdict.</u>

405 Md. at 37 (emphasis supplied).[9]

A legal inconsistency, by contrast, must announce squarely contrary decisions with

respect to actual elements of the two offenses. This does not mean contrary findings of fact

which have logical implications with respect to elements. Every factual inconsistency

necessarily has implications with respect to elements. If that were not so, the factual

inconsistency would be immaterial. Legal inconsistency, by contrast, requires direct

contrariety with respect to elements themselves.

> <u>A legal inconsistency</u>, by contrast, <u>occurs when "an acquittal on one
> charge is conclusive as to an element which is necessary to and inherent in a
> charge on which a conviction has occurred</u>...." [T]he Supreme Court of
> Rhode Island stated that "if the essential elements of the count[s] of which the
> defendant is acquitted are identical and necessary to prove the count of which
> the defendant is convicted, then the verdicts are inconsistent." "<u>Verdicts of
> guilty of crime A but not guilty of crime B</u>, where both crimes arise out of the
> same set of facts, <u>are legally inconsistent when they necessarily involve the</u>

---

[9]See Ashlee Smith, Comment, "Vice-A-Verdict; Legally Inconsistent Jury Verdicts
Should Not Stand In Maryland," 35 <u>U. Balt. L. Rev.</u> 395, 414-15 (2006).

conclusion that the same essential element or elements of each crime <u>were found both to exist and not to exist</u>."

405 Md. at 37-38 (emphasis supplied).[10]

## Preservation As An Iron-Clad Requirement

Because the jury must always be given the opportunity to correct any inconsistency in its verdicts, the concurring opinion made it unmistakably clear that any objection to the verdicts on inconsistency grounds must be made before the verdicts have become final and the jury has been discharged.

> [W]e should not permit the defendant to accept the jury's lenity in the trial court, only to seek a windfall reversal on appeal by arguing that the jury's verdicts are inconsistent. Accordingly, <u>a defendant must note his or her objection</u> to allegedly inconsistent verdicts <u>prior to the verdicts becoming final</u> and the discharge of the jury. <u>Otherwise, the claim is waived.</u>

---

[10] The distinction can admittedly sometimes be a difficult one to make. As the concurring opinion noted, 405 Md. at 36 n.3:

> Appellate courts are ill equipped to determine whether a jury's verdict is illogical factually, or merely "curious." <u>We must be careful not to "confuse a curious verdict with an inconsistent verdict."</u> Hudson v. State, 152 Md. App. 488, 515, 832 A.2d 834, 850 (2003).

(Emphasis supplied). See also Steven T. Wax, "Inconsistent and Repugnant Verdicts In Criminal Trials," 24 <u>N.Y.L. Sch. L. Rev.</u> 713, 721 (1979):

> Running throughout the discordant decisions on inconsistent verdicts is a lack of clarity as to whether inconsistency in verdicts is defined by reference to the facts of the particular case or by recourse to the legal elements of the crimes upon which opposing verdicts were returned.

405 Md. at 40 (emphasis supplied).  Judge Battaglia and Judge Wilner joined Judge Harrell in that part of the concurring opinion.

The reason for this iron-clad preservation requirement is clear.  When inconsistent jury verdicts of conviction and acquittal are rendered, it is more frequently the acquittal that is at odds with the true belief of the jurors than it is the conviction.  The verdict of acquittal is frequently returned in the interest of lenity and actually is a windfall for the defendant. It would be with exceeding ill grace that a defendant would accept the benefit of a jury's incongruous acquittal even while condemning the incongruous conviction, when logically the two should rise or fall together.  The concurring opinion pointed out why a defendant might be well advised to keep silent rather than risk losing his incongruous acquittal.

> In fact, quite often a defendant's optimal choice will be to remain silent, thus waiving his challenge to the inconsistent verdicts and accepting the conviction that may be inconsistent.  A defendant, aware of his or her guilt, or the overwhelming evidence of guilt, of all of the crimes of which he or she stands charged, may choose to accept the jury's lenity.  A defendant may be wise to accept the inconsistent conviction and accompanying sentence, rather than look a gift horse in the mouth.  If the defendant objects to the inconsistent verdicts, the jury, given a second chance, may choose to remedy the error in a manner not in the defendant's favor.

405 Md. at 41 n.9 (emphasis supplied).

Judge Harrell was very clear as to the proper procedure to be followed after a timely objection to a jury's inconsistent verdicts of conviction and acquittal.

> Upon timely objection by the defendant to legally inconsistent verdicts, the trial court should instruct or re-instruct the jury on the need for consistency and the range of permissible verdicts.  The jurors then should be permitted to resume deliberation.  The jury is free to resolve the inconsistency either by

- 45 -

returning verdict in the defendant's favor, <u>convicting on the implicated counts,</u> or deadlocking on a charge so that no inconsistent finding results. "Until the announcement that the verdict has been recorded, the jury has the right to amend or change any verdict; and when it is so amended it is the real verdict of the jury and it may be properly accepted by the court."

405 Md. at 41-42 (emphasis supplied).

## The Ripening of the Concurring Opinion

It took only four years for the concurring opinion in <u>Price</u> to gain acceptance as the authoritative Maryland law on inconsistency. This Court played a role in that acceptance process. In <u>Tate II</u>, on the remand of our opinion in <u>Tate I</u> for reconsideration in light of <u>Price</u>, we reasserted our earlier holding. In doing so, we found highly persuasive the concurring opinion and chose to follow it as binding Maryland law.

> As an additional and independent reason for deciding as we do on this reconsideration, <u>we find significant solace in the well reasoned and articulate concurring opinion of Judge Harrell</u> (joined by Judge Battaglia and in part by Judge Wilner) in <u>Price v. State</u>. <u>It clarifies several vitally important issues that the majority opinion leaves in the dark and that could lead the unwary astray.</u>

182 Md. App. at 129 (emphasis supplied).

We particularly noted the valuable distinction the concurring opinion made between legal inconsistency and factual inconsistency.

> <u>The distinction</u> that the concurring opinion carefully points out between a true legal inconsistency and a mere factual inconsistency <u>is indispensable to any reasonable application of Price v. State. Without that distinction the majority opinion could easily give rise to an epidemic of promiscuous inconsistency claims.</u> (It probably will anyway, but the concurring opinion will at least help to contain the damage.)

182 Md. App. at 130 (emphasis supplied).

- 46 -

We offered, moreover, our own effort at defining the difference between true legal inconsistency and mere factual inconsistency. It classically involves a comparison of the elements of a lesser included offense and a greater inclusive offense.

> A legal inconsistency, by contrast, occurs when the crime for which a defendant is acquitted is, in its entirety, a lesser included offense within the greater inclusive offense for which a defendant is convicted. The commission of the greater crime cannot, as a matter of law, take place without the commission of the lesser crime. The lesser crime is a required element of the greater. The acquittal of the lesser crime precludes the finding of that required element of the greater crime for which the defendant was convicted. That is legal, as opposed to factual, inconsistency. It is something that does not involve speculation about possible or probable factual findings. It is something that can be explained in algebraic terms.

182 Md. App. at 131 (emphasis supplied).

Although not bound to do so, we also found highly persuasive the concurring opinion's prescribed procedure for remedying, when timely requested to, an inconsistency in the jury's verdicts.

> The most welcome breath of fresh air from the concurring opinion is its clarification of the procedure that must be followed if a defendant truly wishes to avoid the illogic of inconsistent verdicts.
>
> ....
>
> Judge Harrell explained that more frequently than not it is the defendant who is the beneficiary of the jury's merciful inconsistency, and that the defendant should be allowed to enjoy the option of accepting the jury's boon of probably undeserved leniency. What the defendant may not do, however, is to have his cake and eat it too. ...
>
> ....

As the concurring opinion points out, <u>it is the prosecutor who most likely has the right to be aggrieved by the inconsistent acquittal rather than the defendant to be aggrieved by the inconsistent conviction.</u>

182 Md. App. at 132-33 (emphasis supplied).

This Court adopted enthusiastically the remedial procedural suggested by <u>Price</u>'s concurring opinion.

<u>The concurring opinion spells out the obvious procedure that must be followed. It is the only procedure that makes sense.</u> The defendant faces the choice either of having the jury resolve the inconsistency or of standing pat and enjoying the inconsistency. <u>He has to decide "when to hold 'em and when to fold 'em." If he chooses the latter, he may not later complain.</u> A defendant simply may not seek to exploit an alleged inconsistency without taking the necessary step to cure or resolve the inconsistency when it is still possible to do so. <u>If a defendant chooses</u>, on the other hand, <u>to cast himself as the champion of jury verdict consistency, he must accept the perils of the part.</u>

182 Md. App. at 136 (emphasis supplied).

In <u>McNeal v. State</u>, 208 Md. App. 510, 28 A.3d 88 (2011), the appellant, relying on the <u>Price</u> majority opinion, claimed that there was a fatal inconsistency between a jury's conviction and its acquittal. The <u>McNeal</u> opinion agreed that there was, indeed, an inconsistency, but noted that it was only a factual inconsistency and not a legal one. Relying on our statement in <u>Tate II</u> that we were following the concurring opinion in <u>Price</u>, this Court rejected the defendant's contention.

In this appeal appellant does not contend that the convictions <u>were</u> legally inconsistent. Instead, <u>appellant argues that we should not recognize the distinction between a legally inconsistent verdict, and a factually inconsistent verdict. Appellant does not even cite Tate, must less try to distinguish it. For the reasons enunciated in Tate, we hold that the trial judge did not err in declining to set aside the conviction</u> for possession of a handgun

- 48 -

by a prohibited person simply because that conviction was factually inconsistent with the jury's acquittal of appellant for wearing, carrying, or transporting a handgun.

200 Md. App. at 518 (emphasis supplied). The stage was set for the Court of Appeals to resolve all lingering doubt. In its McNeal v. State, 426 Md. 455, 458, 44 A.3d 982 (2012), the Court squarely posed the question before it.

> This case beckons us to examine our opinion in Price v. State, 405 Md. 10, 949 A.2d 619 (2008), in which we broke with the majority of jurisdictions nationwide and our own jurisprudence to conclude clearly that legally inconsistent jury verdicts in criminal cases were prohibited henceforth in Maryland. The concurring opinion in Price went to some lengths to explain that the scope of the Court's opinion should be read to extend only to legally inconsistent jury verdicts, but not to factually inconsistent jury verdicts.

(Emphasis supplied).

Everyone agreed that the verdicts in McNeal were factually inconsistent. In rejecting the appellant's contention based on Price, the Court of Appeals officially adopted its earlier concurring opinion in Price.

> McNeal urges that the Court's opinion in Price prohibits these factually inconsistent jury verdicts. Rather, we adopt as our holding here the thrust of the concurring opinion in Price, that jury verdicts which are illogical or factually inconsistent are permitted in criminal trials for reasons we shall explain.

426 Md. at 458-59 (emphasis supplied). There was, however, no legal inconsistency. "There is no lesser included offense or predicate crime involved in McNeal's inconsistent verdicts." 426 Md. at 472.

The Court of Appeals also acknowledged the supporting role played by this Court.

- 49 -

> In McNeal's direct appeal, the Court of Special Appeals adopted as its holding the considered dicta from Tate v. State, 182 Md. App. 114, 130-31, 957 A.2d 640, 649 (2008), which quoted extensively from the concurring opinion in Price.

426 Md. at 461 (emphasis supplied).

## Fine-Tuning

McNeal v. State is where the Maryland law now is with respect to inconsistent verdicts of conviction and acquittal at the hands of a jury. We should take note, however, of some modest fine-tuning by Teixeira v. State, 213 Md. App. 664, 75 A.3d 371 (2013). The fine-tuning has been in two regards. Teixeira, by graphic example, makes more clearly marked than it theretofore had been the fine line separating legally inconsistent verdicts from factually inconsistent verdicts. Teixeira also explores a procedural nuance never before considered as it identifies the precise moment until which a defense objection to a jury's inconsistent verdicts may still be timely made.

## A. Legal Versus Factual Inconsistency

In certain cases, there is, indeed, a very thin and nuanced line between legal inconsistency and factual inconsistency. The definitions that have been tendered, moreover, have been less than models of clarity. The decision in Teixeira, however, makes transparently clear the precise dividing line that had theretofore been a bit blurry.

If there is any discernible pattern to jury inconsistency cases, it seems that a significant percentage of them involve unexpected acquittals on lesser charges involving the

use or possession of weapons. It is as if the jurors were disdainful or at least neglectful if not of lesser charges generally, then of lesser charges involving weapons specifically.

The verdicts in Teixeira seemed to follow such a pattern. The jury had no trouble convicting Teixeira of all substantive criminal offenses – armed carjacking, simple carjacking, conspiracy to commit armed carjacking, armed robbery, simple robbery, unauthorized removal of property, first-degree assault, and second-degree assault. Notwithstanding the clear evidence that Teixeira had used a handgun in perpetrating the offenses, the jury for no apparent reason acquitted Teixeira of both 1) the use of a handgun in the commission of a crime of violence and 2) wearing, carrying, and transporting a handgun. On appeal, 213 Md. App. at 668, "Teixeira maintain[ed] that the jury's acquittal of the handgun charges renders inconsistent those guilty verdicts on charges that were based on the use or possession of a dangerous weapon."

This Court held that the verdicts were clearly inconsistent. As we observed, 213 Md. App. at 681, "what we are left with are verdicts that are factually inconsistent for reasons known but to the jury." The issue before this Court was that of whether the verdicts were only factually inconsistent, which under McNeal would not require reversal, or were legally inconsistent, which under Price would necessitate reversal.

In identifying that line of demarcation, Teixeira, 213 Md. App. at 680, quoted from McNeal, 426 Md. at 458, where it had in turn quoted with approval from People v.

- 51 -

<u>Muhammad</u>, 17 N.Y. 3d 532, 935 N.Y.S. 2d 526, 959 N.E.2d 463, 467 (2011), as the New York Court of Appeals explained:

> "[A] verdict as to a particular count shall be set aside" as repugnant [inconsistent] "only <u>when it is inherently inconsistent when viewed in light of the elements of each crime</u> as charged to the jury" without regard to the accuracy of those instructions. <u>The underlying purpose</u> of this rule <u>is to ensure that an individual is not convicted of "a crime on which the jury has actually found that the defendant did not commit an essential element, whether it be one element or all." A person cannot be convicted of a crime if a jury has necessarily decided that one of the essential elements was not proven beyond a reasonable doubt.</u>

(Emphasis supplied).

In making the distinction between legal inconsistency and factual inconsistency, the focus is not on inconsistent factual findings but on inconsistent elements. Sets of elements can be compared to each other in a vacuum without any reference to the actual facts in the case. This Court took that approach in <u>Teixeira</u>.

In comparing the convictions with the acquittals, we noted that the critical element in the two crimes resulting in acquittal was a handgun. The convictions for armed carjacking and armed robbery, on the other hand, did not involve, as an element, the use of a handgun. They were based on a different element – the use of a deadly weapon generally. As we observed, 213 Md. App. at 681, "Neither offense requires the use of a 'handgun.'" Although the only factual evidence involved a handgun, a handgun was not an actual element of the crimes resulting in convictions. With respect to mere factual inconsistency, we concluded:

> The jury's choices in this regard, while a source of wonder, are beyond appellate scrutiny.

213 Md. App. at 683.

## B. Closely Calibrating the Crack of Doom

Teixeira discovered a nuance that we had never thought about before. In announcing the rule of law that a defendant must make timely objection to inconsistent jury verdicts in order to preserve the issue for appellate review, the case law has used various verbal formulations. The concurring opinion in Price at one point said that "a defendant must note his objection to allegedly inconsistent verdicts prior to the verdicts becoming final and the discharge of the jury." 405 Md. at 42 (emphasis supplied). This Court in Tate II, 182 Md. App. at 132, characterized the Price concurrence as saying "he must present that claim to the circuit court before the jury is discharged." (Emphasis supplied).

Such words should not be taken literally, however, because the case law was not remotely considering the possibility of a difference between the rule that was being announced and the underlying reason for the rule that was being announced. The case law was not contemplating the thought that there might be some "wriggle room" between. In terms of the reason for the rule, the Price concurring opinion also announced that the thing that would "constitute waiver" was the failure to object when the court still has an opportunity to remedy the error. 405 Md. at 42. An arcane little scenario that no one ever imagined prompted the question of what happens when the objection comes, to be sure, after

the jury has been discharged but at a time when the court and jury can still unquestionably remedy the error?

Teixeira raised the issue. After the jury found Teixeira guilty on all but the weapons counts, the jurors were polled and hearkened. The judge excused them and thanked them for their service, but then sent them back to the jury room, escorted by the clerk, in order to retrieve their personal belongings. It was at that moment that defense counsel raised the issue of inconsistent verdicts and asked the court for permission to argue the issue "before the jury leaves." The judge directed the clerk to "have the jury remain" while that discussion took place. The ultimate issue in Teixeira was whether the defense objection was timely. This Court in Teixeira held that it was.

> Although Teixeira did not question the verdicts until after the jurors were excused from the courtroom, the trial judge directed the clerk to hold the jury shortly after counsel raised this issue. The venire remained subject to recall and was finally dismissed only after the trial judge heard argument and ruled. On the record before us, we conclude that his question about the propriety of the verdicts was timely.

213 Md. App. at 674 (emphasis supplied).

Sitting in that jury room – in what science fiction writers might call a "time warp" – and still isolated from the outside world was, to be sure, not a jury but 12 ex-jurors still capable of being reconstituted as a jury at a moment's notice. If a hastily formulated rule inadvertently and informally used such a word as "dismissed" or "discharged," such a rule might hypertechnically have been offended. The reason behind the rule, however, was clearly not offended. Judge Thieme's opinion explained:

- 54 -

> Thus <u>the operative element in determining when and whether a jury's functions are at an end is not when the jury is told it is discharged but when the jury is dispersed</u>, that is, has left the jury box, the court room or the court house, had an opportunity to discuss the case with others and <u>is no longer under the guidance, control and jurisdiction of the court.</u> We conclude that Teixeira may challenge the verdicts as inconsistent.

213 Md. App. at 677 (emphasis supplied). The ultimate concern is not with the dismissal of the jurors but with the dispersal of the jurors.

### Inconsistent Verdicts From A Judge Alone

Notwithstanding the whirlwind roller coaster ride taken by the law of verdict inconsistency at the hands of a jury – from the common law's stern prohibition to a century of benign indulgence per <u>Steckler</u>-<u>Dunn</u>-<u>Powell</u> to Maryland's apparent return to a blanket prohibition in <u>Price</u> to the ameliorating reassurances of the <u>Price</u> concurrence and <u>Tate II</u> and <u>McNeal</u> – the law of verdict inconsistency at the hands of a judge alone (or the judge/jury combination) has, by contrast, never budged.

If verdicts of conviction and acquittal are inconsistent (legally or factually) at the hands of a judge, the common law generally and Maryland specifically have always held such inconsistency to be reversible error. <u>Johnson v. State</u>, 238 Md. 528, 542-45, 209 A.2d 765 (1965); <u>Shell v. State</u>, 307 Md. 46, 55, 512 A.2d 358 (1986) ("In the present case, however, the inconsistent verdicts were rendered by a judge, not by a jury. The <u>Ford</u> holding does not justify inconsistent verdicts from the trial judge."); <u>Wright v. State</u>, 307 Md. 552, 576, 515 A.2d 1157 (1986) ("Inconsistent verdicts by the court are not ordinarily permitted as a matter of Maryland common law."); <u>Hoffert v. State</u>, 319 Md. 377, 385 n.2,

- 55 -

572 A.2d 536 (1990) ("Inconsistent verdicts in a court trial are not tolerated. The rationale for sustaining them in a jury trial does not support allowing them to stand in a court trial."); State v. Anderson, 320 Md. 17, 29, 575 A.2d 1227 (1990) ("It is settled in this State, as a nonconstitutional common law principle, that inconsistent verdicts of guilty and not guilty, by a trial judge at a nonjury trial, are not ordinarily permitted."); State v. Williams, 397 Md. 172, 189-90, 916 A.2d 294 (2007) ([I]t is also well settled in Maryland that inconsistent verdicts of guilty and not guilty, by a trial judge at a nonjury trial, are not ordinarily permitted."); Price v. State, 405 Md. 10, 19, 949 A.2d 619 (2008); McNeal v. State, 426 Md. at 470;  Stuckey v. State, 141 Md. App. 143, 157-58, 784 A.2d 652 (2001) ("Inconsistent verdicts by a trial judge are not tolerated."); Tate I, 176 Md. App. at 385 ("Traditionally the law has also always looked with a far more jaundiced eye on inconsistent verdicts returned by a trial judge siting without a jury than on inconsistent verdicts returned by a jury.").

In the wake of Steckler v. United States (1925) and Dunn v. United States (1932), it was felt by many that the indulgence being shown to inconsistent verdicts of conviction and acquittal by a jury might portend equally indulgent treatment of inconsistent verdicts returned by a judge alone, notwithstanding the fact that the special circumstances given by Judge Hand and Justice Holmes for tolerance in the case of jury trials did not apply to nonjury trials by the judge alone.

The decision of Judge Henry Friendly for the Second Circuit in United States v. Maybury, 274 F.2d 899 (1960), however, put to rest any such expectations. Judge Friendly's

opinion, now universally followed, explained succinctly why the indulgence extended to inconsistent jury verdicts would be totally inappropriate for such inconsistencies in nonjury trials.

> [T]he Dunn rule should not be extended to a criminal trial before a judge.
>
> The Steckler and Dunn opinions show on their face that the decision to ignore inconsistencies in the verdict of a jury in a criminal case was based on special considerations relating to the nature and function of the jury in such cases rather than on a general principle to be applied even when these considerations were absent.

274 F.2d at 902 (emphasis supplied).

There were similarly expectations among prosecutors that if the Price concurring opinion were to prevail (which it has), inconsistencies in verdicts rendered by a judge alone might enjoy the partial indulgence implicit in the distinction between legal inconsistency and factual inconsistency. McNeal, however, rejected such an even partial indulgence for the same reasons given by Judge Friendly in United States v. Maybury.

> The "take away" message from Williams is that only juries, because of their singular role in the judicial system, deserve deference with regard to inconsistent verdicts, which may be the "'product of lenity, mistake, or a compromise to reach unanimity, and that continual correction of such matters would undermine the historic role of the jury as the arbiter of questions put to it.'"

426 Md. at 470 (emphasis supplied). The distinction between legal inconsistency and factual inconsistency, now vitally important in assessing jury inconsistencies, thus has no pertinence when examining inconsistent verdicts by a judge alone.

The law on inconsistent verdicts of conviction and acquittal returned by a judge is today exactly the same unameliorated law that it has been in Maryland since at least 1965.

## A Cautionary Note

The stark distinction between the treatment of inconsistent verdicts in jury trials and in bench trials illustrates something else. In this complicated whirl of inconsistent verdicts, there is little by way of a common denominator. Inconsistent convictions, for instance, are in a class by themselves and should not even enter into the discussion of inconsistencies between convictions and acquittals. Between jury trials and bench trials, moreover, there are more dissimilarities than similarities in handling their respective inconsistencies. Our analysis would be a lot cleaner, therefore, if we could carefully differentiate between the different types of inconsistency and refrain from trying to squeeze dissimilar problems under a single umbrella. Too many cases are cited that are not pertinent, and we spend too much time distinguishing.

It is the highly particularized problem of arguably inconsistent verdicts by the judge alone that we are dealing with in this case.

## Marginal Evidence of Sexual Contact

In this case, the evidentiary proof of the vaginal intercourse and the fellatio, on the one hand, and the evidentiary proof of the "sexual contact" that was the basis for both the third-degree and the fourth-degree sexual offense charges, on the other hand, were very different. The evidence as to the vaginal intercourse and as to the fellatio was loud and

clear. With respect to the sexual contact, it was far more vaporous. Maryland Code, Criminal Law Article, § 3-301(f)(1) defines "sexual contact."

> "Sexual contact," as used in §§ 3-307, 3-308, and 3-314 of this subtitle, means <u>an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification</u>, or for the abuse of either party.

(Emphasis supplied).

What is involved in sexual contact is purposeful tactile contact and tactile sensation, not incidental touching. It is the sexually-oriented act of groping, caressing, feeling or touching of the genital area or the anus or the breasts of the female victim. It is something other than the necessarily involved contact that is merely incidental to the vaginal intercourse or the sexual act itself.

The evidence of what the sexual contact consisted of, as a mere lesser included charge, was extremely vague. The only witness to the sexual contact was the victim herself during her intermittent periods of consciousness. The victim was necessarily conscious, of course, because her testimony, her recollection, was the only evidence we have of any sexual contact. She described her state of semi-consciousness.

> Q. <u>Did you fully wake up during any of this?</u>
>
> A. <u>No.</u>
>
> Q. Okay. So –
>
> A. I remember – I remember – <u>I remember it happening.</u> I – it's hard to – <u>it's hard to explain.</u> <u>It almost felt like a dream.</u>

- 59 -

(Emphasis supplied).

The victim's testimony as to sexual contact <u>per se</u> consisted exclusively of the following:

> I remember him pulling on my left shoulder to turn me over. And I remember him – <u>I remember him kissing me on the mouth. I remember him putting his hands under my shirt.</u> I remember him – I remember rolling – trying to roll back over. And <u>I remember him pulling my pants down</u> while I was on my right side. He was behind me. <u>I remember him trying to have anal sex with me.</u> I remember him pulling on my shoulder a few times hard enough where I had a bruise on my shoulder.

(Emphasis supplied).

If this trial had been about the sexual contact alone, the vagueness would have been inconceivable. The charge was largely neglected because it was only peripheral. When the appellant put his hands under the victim's shirt, did he feel her breasts? When he pulled her pants down, did he fondle her genital area? The court was never told. This was all left very imprecise, as if it were nothing more than background description for the proof of the major charges.

The sexual contact in the fourth-degree sexual offense and the sexual contact in the third-degree sexual offense were, on the other hand, necessarily the same and we must look at the divergence in those two verdicts in more detail. With respect to the first two of the three alleged verdict inconsistencies, however, we have little difficulty. An acquittal on the charge of sexual contact and convictions for second-degree rape and a second-degree sexual offense (fellatio) would by no means be factually or logically incompatible. The evidence

- 60 -

of sexual contact was a lot closer to being legally insufficient than was the evidence of vaginal intercourse and fellatio.

## Divergent Modalities of Proving Lack of Consent

As an abstraction and in a larger sense, the appellant is right that all four of the sexually oriented charges in this case (the three convictions and the acquittal) involve the lack of consent on the part of the victim. That generic concept of "absence of consent," however, can be established in various ways.

For the conscious and competent victim, mere passivity, as we have stated, is not enough. Some at least modest verbal or physical resistance must be shown by a victim or some additional or aggravating conduct on the part of the predator must be shown that either overcomes resistance or puts the victim in reasonable fear of resisting. That is why, for second-degree rape, § 3-304(a)(1) adds the element of "by force, or the threat of force." In verbatim fashion for a second-degree sexual offense, § 3-306(a)(1) adds the element of "by force, or the threat of force." For a third-degree sexual offense, § 3-307(a)(1) insists that the proscribed sexual contact not only be "without the consent of the other" but must be supplemented by at least one of four specific aggravating factors.

The State did not in this case prove the absence of consent by any of those modalities required when dealing with a conscious and competent victim. It turned instead to an alternative modality for establishing the lack of consent. In verbatim terms, § 3-304(a)(2), § 3-306(a)(2), and § 3-307(a)(2) forbid the prohibited sexual behavior

- 61 -

if the victim is a mentally defective individual, a mentally incapacitated individual, <u>or a physically helpless individual</u>, and the person performing the act knows or reasonably should know that the victim is a mentally defective individual, a mentally incapacitated individual, or a physically helpless individual[.]

(Emphasis supplied).

Under the statutory alternative for proving the lack of consent, proof of the very status of the victim, as one unable to give consent or to give legally competent consent, establishes the lack of consent automatically. It was this modality that the State employed for all three of its convictions. The State showed that the victim was asleep when the sexual intercourse began and when the fellatio began. As someone who was asleep, the victim was, in the terms of the statutory provisions, "a physically helpless individual" unable to give consent.

When it came to the fourth-degree sexual offense, however, no such statutory alternative was available. As the verdict rendering process was winding down, the lack of that statutory alternative was decisive.

> THE COURT: ... <u>Count No. 4</u>, sexual – <u>how is that distinguished from Count No. 3?</u>
>
> [THE PROSECUTOR]: <u>It doesn't have the added requirement that she be physically helpless, so it's any non-consensual sexual contact.</u> So – but it would merge into the third degree sex offense for that –
>
> THE COURT: Well, yeah, but I still need to make a finding. Okay. Well, it's a person may not engage in sexual contact with another without the consent. <u>It doesn't have the wording as to unaware or unable, so</u>, therefore, <u>I'm going to find him not guilty of Count No. 4.</u>

(Emphasis supplied).

For the three convictions, the trial judge was able to find that the victim was asleep and, for that reason alone, could not give consent. For the acquittal, the statutory alternative of being asleep was not available. "And that made all the difference."[11] The convictions were based on the finding that the victim was asleep. The acquittal made no finding to the contrary. We hold that there was no fatal inconsistency between the convictions and the acquittal.

## A Procedural Back-Up

Simply as a cautionary back-up position, we note that the appellant was either blissfully unaware of any inconsistency in his verdicts as they were announced or was content to enjoy his windfall of an acquittal. McNeal v. State, 426 Md. at 466, not only raised to the authoritative level the Price concurring opinion's distinction between legal inconsistency and factual inconsistency but also its procedural requirement that any objection on inconsistency grounds shall be made promptly after the verdicts are rendered.

> Only a defendant, not the State, may object to an inconsistent verdict. The objection must be made prior to verdict finality and discharge of the jury ..., thus preventing the defendant from accepting the inconsistent verdict and seeking thereafter a windfall reversal on appeal.

(Emphasis supplied).

---

[11]Robert Frost, "The Road Not Taken."

As the trial ground to a halt, there was not a glimmer of an objection to inconsistent verdicts.

> THE COURT: ... It doesn't have the wording as to unaware or unable, so, therefore, <u>I'm going to find him not guilty of Count No. 4.</u> And then Count No. 5 is assault in the second degree. So <u>I will enter</u> – based on the testimony, enter <u>a finding of guilty as to that count.</u> <u>Is there a need for a pre-sentence investigation in this case?</u>
>
> [PROSECUTOR]: I'm not sure, Your Honor. I do have the Defendant's criminal record with me today. I don't know if [Defense Counsel] believes that a PSI is necessary.
>
> [DEFENSE COUNSEL]: <u>I would ask the court to proceed to sentencing.</u>
>
> THE COURT: All right.

(Emphasis supplied). To ask the court to proceed to sentencing is not to lodge an objection to inconsistent verdicts.

## A Non-Preserved Complaint

At the end of the trial, the arrival at the verdicts and the rendering of the verdicts was done in a relatively informal and almost collective fashion, as the judge and both lawyers essentially talked their way through the process as a joint enterprise, disposing of one charge before going on to the next. As the court disposed of the rape charge and moved on to the second-degree sexual offense charge, the collective discussion went as follows:

> THE COURT: Travis has violated Section 3-304, <u>rape in the second degree</u>, and, therefore, <u>I'm going to find him guilty of that offense.</u> <u>Likewise – well, 306 is sexual contact,</u> I believe.

- 64 -

[PROSECUTOR]:  It's the – that's second degree sex offense, Your Honor.

THE COURT:  I'm sorry?

[PROSECUTOR]:  It's sexual act with the victim being physically helpless.

[DEFENSE COUNSEL]:  Okay.  But – but –

THE COURT:  Okay.  Well, let me see what [the] sexual act is.

[PROSECUTOR]:  That would include – that would be the –

THE COURT:  Well, sexual act is –

[PROSECUTOR]:  Fellatio, that would be the State's theory.

THE COURT:  Do you want to be heard as to that?

[DEFENSE COUNSEL]:  Yeah.  I don't think there was the act of fellatio as defined –

THE COURT:  I agree.

[DEFENSE COUNSEL]:  And there was not anilingus.  Although, there was some testimony to that effect, but there was no testimony of the elements.

THE COURT:  Right.  So I'll find him not guilty of Count 2.  Count 3 –

[PROSECUTOR]:  Your Honor, can I respond briefly to that?

THE COURT:  Sure.

[PROSECUTOR]:  In terms of the second degree sex offense, the fellatio, any contact with the victim's mouth would be sufficient.  So her describing that it touched her teeth, that's – that would be the State's theory as to the second degree sex offense.

- 65 -

[DEFENSE COUNSEL]: And my response is, there is some validity to the argument, but that would go to sexual contact, which is a third degree sex offense, which only requires a touching.

[PROSECUTOR]: And –

[DEFENSE COUNSEL]: That the act requires more. Because, otherwise, it wouldn't even be any need to have a third degree sex offense.

[PROSECUTOR]: Your Honor –

THE COURT: Go ahead.

[PROSECUTOR]: – if I may respond. In the notes, fellatio is defined as encompassing oral contact with the male –

THE COURT: Okay. Wait a minute. Where are you reading?

[PROSECUTOR]: I'm sorry. The note that says fellatio defined, and it refers to Thomas v. State.

THE COURT: Okay.

[PROSECUTOR]: It defines it as oral contact with a male sexual organ and penetration of the mouth is not required. So any contact with the victim's mouth would be sufficient. And with reference to [Defense Counsel]'s comments, the [third] degree sex offense would be referring –

THE COURT: Well, let's – I'm going to do one at a time. Are you – do you have it, 158 at the bottom? Fellatio encompasses oral contact – oral contact with the male sex organ and penetration of the mouth is not required. So based on the Thomas case, I – because there is testimony that his penis did make contact with her teeth and she kept her teeth closed so that that was the extent of what occurred, therefore, I will find him guilty of Count No. 2.

(Emphasis supplied).

The appellant now contends that principles of double jeopardy have been offended because he had been pronounced not guilty of the second-degree sexual offense and the

judge subsequently subjected him to a second jeopardy.  We do not read the finality into that still fluid discussion that the appellant chooses to.  Everyone was simply thinking out loud, not yet pronouncing judgments.

The easy answer, however, is that no objection was made and the point is not preserved for appellate review.  From the context itself, it is clear that defense counsel was continuing to engage in the ongoing discussion of precisely what fellatio consists of.  Double jeopardy is very much of an appellate afterthought.

Recognizing his non-preservation problem, the appellant invites us to notice plain error.  In seeking to qualify for a relaxation of the preservation requirement, the appellant argues that he is requesting a "plain error" exemption from preservation not pursuant to the regularly invoked provision of Maryland Rule 8-131(a), but under the less familiar authority of Rule 8-131(c), which applies to the review of verdicts in non-jury trials.  As Judge Greene made clear for the Court of Appeals, however, in Bryant v. State, 436 Md. 653, 668-69, 84 A.3d 125 (2014):

> [W]e do not agree with Petitioner that Rule 8-131(c) provides an avenue for this Court to exercise its authority to review an otherwise unpreserved or waived issue.  Rule 8-131(c) neither expressly nor implicitly provides an exception to our general preservation rules or the contemporaneous objection rule.

(Emphasis supplied).

Even if the appellant were able, <u>arguendo</u>, to persuade us that we could, should we wish to do so, notice plain error, he has failed to persuade us why we might wish to. The short answer is that we don't.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**