*Annera Georges v. State of Maryland*, **No. 2186 of the September 2019 Term,**
**Opinion by Moylan, J.**

**HEADNOTE:**

TWO COUNTS OF THIRD-DEGREE SEXUAL OFFENSE – A PATCH OF ROUGH WATER OR AN ICEBERG? – THE CASE AT HAND – THE CONTENTIONS – WHAT THE FIRST CONTENTION IS REALLY ABOUT – SOUND AND FURY – THE STANDARD FOR A MISTRIAL: A SENSE OF BALANCE – A MATTER OF BROAD DISCRETION – THE ABUSE OF DISCRETION STANDARD: THE *RAISON D'ÊTRE* FOR DEFERENCE – THE TIEBREAKERS: THE OBJECTION WAS IMMEDIATELY SUSTAINED – THE TIEBREAKERS: A CURATIVE INSTRUCTION WAS IMMEDIATELY GIVEN – "CALM SEA AND PROSPEROUS VOYAGE" – THE INFINITE VARIETY OF SEXUAL CONTACT – COMPILING THE UNITS OF PROSECUTION – A HELPFUL ANALOGY – CONSOLIDATION VERSUS MULTIPLICATION – STATE V. BEY: A FALSE ANALOGY – THE LEGAL PROBLEM IS A LINGUISTIC PROBLEM

Circuit Court for Wicomico County
Case No. 22-K-13-000806

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2186

September Term, 2019

_____

ANNERA GEORGES

V.

STATE OF MARYLAND

_____

Beachley,
Wells,
Moylan, Charles E., Jr.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Moylan, J.

_____

Filed:  September 9, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal is not about the existence or the absence of trial error. Our topic takes some trial error for granted, but moves quickly beyond it. We begin with the proposition that there is no such thing as a perfect trial. Every hard-fought and spirited contest inevitably produces a few bumps and bruises. It is the collective wisdom of the American trial process, however, that hard-fought and spirited trials generate their own reward and that the inherent value of the adversarial system accepts the cost of a few bumps and bruises along the way. The absolute necessity on a turbulent playing field, however, is an umpire with a sense of calm balance who neither callously ignores the bumps and bruises nor overreacts to the robust nature of the hard-fought contest. The need for that sense of realistic balance is the subject of this appeal.

The bumps and bruises of hard-fought trials come in all shapes and sizes. One phase of the trial process that is notoriously productive of them is closing argument to the jury. In Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799 (1897), the Supreme Court cautioned against overreaction at that stage of the proceedings:

> If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation.

(Emphasis supplied.)

The opinion of Judge O'Donnell for the Court of Appeals in Wilhelm v. State, 272 Md. 404, 326 A.2d 707 (1974) has become the Ur-text in Maryland on the subject of handling objections to arguable excesses in the course of final jury argument. He described, 272 Md. at 413, the sometimes rough-hewn character of jury argument:

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined - no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

(Emphasis supplied.)

## A Patch Of Rough Water Or An Iceberg?

An improper remark, in and of itself, is seldom cause for reversing a trial verdict. In Reidy v. State, 8 Md. App. 169, 172, 259 A.2d 66 (1969), it was Chief Judge Robert C. Murphy (later Chief Judge of the Court of Appeals) who explained for this Court that a reversal would not be justified unless it appeared that the jury had actually been prejudicially misled by the improper remark or "influenced to the prejudice of the accused:"

[T]he fact that a remark made by the prosecutor in argument to the jury was improper does not necessarily compel that the conviction be set aside. The Maryland Rule is that unless it appears that the jury were actually misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of the conviction on this ground would not be justified.

(Emphasis supplied.)

In Wilhelm v. State, 272 Md. at 413, Judge O'Donnell had also made it clear that the application of a sense of balance is a judgment call that is in the first instance entrusted to the broad discretion of the umpire on the field and not to the league office in more leisured appellate retrospect:

2

> The conduct of the trial must of necessity rest largely in the control and discretion of the presiding judge and an appellate court should in no case interfere with that judgment unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party.

(Emphasis supplied.)

When, therefore, the issue is not so much that of error *vel non* but rather that of the appropriate response to the error, the critical need is for calm perspective. It is not so much a question of "What?" as it is a question of "How much?" As the appellate court assesses the entire trial voyage, of which the brief contretemps in closing argument is but a part, was that incident a mere patch of rough water or had the trial at that point truly struck an iceberg? The appellant now insists that in this case the captain had no choice but to order, "Abandon Ship!" The State responds that the captain's sure and steady hand on the tiller properly kept the ship on its intended course. The critical issue, of course, is not the initial bump in the jury argument, but the appropriateness of the ensuing response. Did this trial experience, at worst, a patch of rough water or should the entire trial have been totally aborted? And who, moreover, gets to make that call?

### The Case At Hand

The appellant, Annera Georges, was convicted in the Circuit Court for Wicomico County by a jury, presided over by Judge Leah J. Seaton, of two counts of sexual abuse of a minor, one count of second-degree rape, two counts of a third-degree sexual offense, and three counts of incest. Judge Seaton sentenced the appellant to a cumulative sentence of 74 years, with all but 33 years suspended, to be followed by five years of supervised probation.

## The Contentions

On this belated appeal pursuant to a grant of post-conviction relief, the appellant asks two questions:

1. **DID THE COURT ERR IN DENYING APPELLANT'S MOTION FOR MISTRIAL WHERE THE PROSECUTOR REPEATEDLY MISREPRESENTED OR SOUGHT TO MISREPRESENT THE RESULTS OF SEROLOGICAL TESTING BY THE STATE'S EXPERT AND DENIGRATED DEFENSE COUNSEL?**

2. **DID THE COURT ERR IN IMPOSING MULTIPLE SENTENCES FOR THIRD-DEGREE SEXUAL OFFENSE?**

## What The First Contention Is Really About

The issue before us on this first contention is a very limited one. That limited nature of the issue calls for some explanation, for it is critical to our ultimate holding. The entire contention arises out of a single objection the appellant made, late in the trial, to a single remark by the State in the course of its rebuttal argument to the jury. The appellant objected and moved for a mistrial. Judge Seaton immediately sustained the appellant's objection, instructed the jury to "disregard the partial sentence that was made by the prosecutor," and then denied the motion for a mistrial. At that point, defense counsel seemed content with Judge Seaton's handling of the matter. The following exchange pretty well summed up the relative insignificance of the entire controversy:

> [THE COURT]: <u>I'm sustaining your objection, but denying your motion for a mistrial</u>.
>
> [DEFENSE COUNSEL]: All right.
>
> [THE COURT]: <u>Did you want to put an argument on the record about a motion for a mistrial</u>?

4

[STATE'S ATTORNEY]: <u>No, Your Honor</u>.
(Emphasis supplied.)

The phlegmatic tone of that exchange also pretty well sums up our response to this contention. We do not intend to anguish over the close question of whether the State's brief remark was just within the confines of propriety or was just over the line, because the answer is unimportant to our holding. Whether an error occurred is a close question. It could be argued plausibly either way. The only issue before us, however, is not whether the remark was proper or improper. The only issue that we are concerned with is whether the remark was so devastating to the prospects of a fair trial as to make the extreme sanction of declaring a mistrial imperatively necessary.

## Sound And Fury

When the issue on appeal is the declaration <u>vel</u> <u>non</u> of a mistrial, the critical measurement is that of a toxic amount of error, not error <u>per</u> <u>se</u> but a toxic amount of error. A factual predicate of no error, of course, would support a conclusion that there was no such amount of toxic error. Equally supportive of that same conclusion, however, would be a factual predicate that there was, or might have been, only a small or non-toxic amount of error. It is, therefore, a matter of sublime unconcern whether the partial predicate for a holding that a mistrial was not compelled was that of no error or that of only small error. A battle over equally supportive predicates, therefore, would truly be a tempest in a teapot. It would be a clatter of irrelevant noise, "full of sound and fury signifying nothing."[1]

---

[1]     Shakespeare, <u>Macbeth</u>, Act 5, Scene 5.

5

The victim of the sexual crimes in this case was G., the daughter of the appellant. She was brought to this country by the appellant from Haiti when she was 16 years of age. The sexual abuse of G. consisted of regular and countless acts of sexual intercourse and a wide variety of other sexual offenses over the course of two years. The abuse began in March of 2012, just after G. turned 17. It continued until November of 2013, shortly before G. turned 19. The abuse occurred at home, sometimes in the appellant's bedroom and sometimes in the bedroom that G. shared with her two siblings.

It was on November 8, 2013 that the police executed a search warrant on the appellant's home. They recovered bed linens, a pair of girl's underwear, a pair of girl's sweatpants, two pairs of men's underwear, two pairs of men's sweatpants, and two bath towels. The scientific examination of these items produced nothing of any significance.

The contention before us centers on the examination of a single pair of the appellant's underpants conducted by Molly Rollo, a forensic scientist with the Maryland State Police. The ultimate question of interest was whether Ms. Rollo's examination of the appellant's underpants did or did not show in the crotch area the presence of seminal fluid. The ultimate test showed that no seminal fluid was present. The ultimate test, however, was preceded by a preliminary test, and that is where overzealous counsel has made a mountain out of a molehill. The initial or "presumptive" test was for the presence of acid phosphatase, a component of seminal fluid. Because that test was "inconclusive," a more thorough confirmatory test was required. That confirmatory test concluded that no seminal fluid was present. Ms. Rollo explained the relationship between the presumptive test and the confirmatory test:

We test for – there is multiple levels of testing that we do. The first is what we call a presumptive test. This is a test that's generally less specific but more sensitive. So there were areas that tested positive for the presumptive test for semen, or, well, they were inconclusive. So it means that we couldn't really tell. There may or may not have been semen present. But when we then took it a step farther and looked for the presence of sperm, themselves, by examining a microscopic slide to look for the actual sperm cells, we did not find any sperm cells. So we report it as no semen was obtained from the samples.

(Emphasis supplied.)

When in closing jury argument, however, defense counsel stated that "there was no forensic evidence to support the victim's claims," the prosecutor took immediate umbrage to what she deemed to be a rejection of even the initial or presumptive test and rose to the imagined challenge, ready for a fight. The prosecutor began:

The report does say that there were no sperm, no spermatozoa. However, on those underwear, there was a presumptive test that was positive for semen, and that the acid phosphatase –

(Emphasis supplied.) Judge Seaton, commendably, sustained the defense objection before the prosecutor could even finish her sentence and promptly admonished the jury to "disregard the partial sentence that was made by the prosecutor." Judge Seaton was not about to entertain a spirited fight over essentially nothing.

Once tempers had cooled, we find it hard to imagine why the Assistant State's Attorney even cared that the "presumptive" test was not flat-out exculpatory but only "inconclusive." What was at issue was fundamentally peripheral. Whether on November 8, 2013, there were or were not traces of the appellant's seminal fluid on the crotch area of the appellant's underpants would not, in either event, have contributed anything in favor

7

of the State's case or in favor of the appellant's case beyond the most exceedingly trivial. It was, by the most realistic assessment, truly a tempest in a teapot.

What is important here, however, is what the case is not about. It is not about whether the half sentence that the State managed to blurt out before the objection was sustained was or was not improper. The State claims that it was making an "invited response" to the closing argument of defense counsel. *See* <u>Whack v. State</u>, 433 Md. 728, 751, 73 A.3d 186 (2013). That is questionable, but the real issue is that of whether it, right or wrong, actually made any appreciable difference. The State was, to be sure, sailing dangerously close to the wind. Even if proper, however, the remark was just barely so. It was right on the line. If, on the other hand, it was improper, it was again just barely so. Again, it was right on the line. The glitch, if there were one, was essentially trivial. The objection was immediately sustained. The jury was immediately admonished to ignore the remark. The appellant appeared to be completely mollified and did not ask for further redress. This trial may have nudged a floating log. It obviously had not hit an iceberg. All bumps are not created equal.

On appeal, however, both the appellant and the State appear to be engaged in meaningless combat over what seems to us to have been at most an utter irrelevancy. The appellant's sustained and multitudinous sexual assaults on G. took place regularly and repeatedly over the course of two years. The number of sexual assaults would have numbered in the dozens if not in the hundreds. G reported the crimes to a counselor from the Wicomico County Child Advocacy Center on November 7, 2013. She reported that the last of the attacks had occurred at some time during the preceding week. A pair of the

8

appellant's underpants, <u>inter alia</u>, was seized on November 8, 2013. The epicenter of the current controversy is whether an examination of the crotch area of the underpants did or did not reveal the presence of semen that might have been deposited in a period of several days immediately prior to November 8, 2013.

The answer to that question, yea or nay, could have had no impact on the outcome of this trial. The absence of seminal fluid, as was the case, would not have exculpated the appellant, and it did not. The presence of seminal fluid, on the other hand, would not have inculpated the appellant, and it did not. Might it have indicated that he had had an ejaculation since the last time that his underpants had been laundered? Perhaps so. But what would that have tended to prove? A wet dream? Masturbation? Sexual intercourse with the woman, Mimelon, with whom he was living? Its contribution toward proving the charges against the appellant would have been so minimal as to have been absolutely nugatory.

## The Standard For A Mistrial:
## A Sense Of Balance

The focus, of course, is not on whether an improper remark was made, but on whether a mistrial was required. There is a massive difference between those two issues. An improper remark by the prosecutor is never in and of itself an adequate reason for the declaration of a mistrial. It is further required that the improper remark was likely to have misled the jury to the prejudice of the accused. As Judge Cathell wrote for the Court of Appeals in <u>Degren v. State</u>, 352 Md. 400, 430, 722 A.2d 887 (1999):

> <u>Not every improper remark</u>, however, <u>necessarily mandates reversal</u> and what exceeds the limits of permissible comment depends on the facts in each case. We

9

have said that <u>reversal is only required where it appears that the remarks of the prosecutor actually misled the jury</u> or were likely to have misled or influenced the jury to the prejudice of the accused. <u>This determination of whether the prosecutor's comments were prejudicial or simply rhetorical flourish lies within the sound discretion of the trial court</u>.

(Emphasis supplied.)

In <u>Rutherford v. State</u>, 160 Md. App. 311, 323, 863 A.2d 1031 (2004), Judge Barbera (now Chief Judge of the Court of Appeals) wrote for this Court:

The grant or denial of a motion for mistrial is a matter within the discretion of the trial court, and the exercise of that discretion will not be reversed absent an abuse of discretion. <u>The grant of a mistrial is an extreme sanction that courts generally resort to only when no other remedy will suffice to cure the prejudice</u>.

(Emphasis supplied.)

## A Matter Of Broad Discretion

The issue now before us, therefore, is not whether an initial error was or was not committed by the State. That was so close a question that a trial judge's call in that regard would not have been an abuse of discretion, whichever way it went. Under the circumstances, it is not worth the time or the effort or the anguish to engage in a labored analysis of an issue that is immaterial. It simply does not matter.

The only issue that matters before us is not whether an error did or did not occur, but only that of whether a mistrial should or should not have been declared. That is a very different decision far down the continuum of likely prejudice. That decision in this case was entrusted to the broad discretion of Judge Seaton, who ruled that no such mistrial was required. In reviewing such an exercise of discretion, the Court of Appeals explained in <u>Cooley v. State</u>, 385 Md. 165, 174, 867 A.2d 1065 (2005):

> [A] trial judge is afforded considerable discretion in deciding a motion for mistrial, and "in a case involving a question of prejudice which might infringe upon the right of the defendant to a fair trial, <u>that decision is reviewable</u> on appeal <u>to determine whether or not there has been an abuse of that discretion</u> by the trial court in denying the mistrial.

(Emphasis supplied.)

In that same regard, the landmark case of <u>Wilhelm v. State</u>, 272 Md. at 429 had earlier declared:

> In considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of unfairly creating prejudice against the defendant, recognition must be given to the fact that <u>the trial judge</u>, <u>who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess</u>-in the context in which the remarks are made and their relationship to other factors in the trial-<u>whether they were in fact prejudicial</u>. In the environment of the trial <u>the trial court is peculiarly in a superior position to judge the effect of any of the alleged improper remarks</u>.

(Emphasis supplied.) Judge Seaton's thumb was on the pulse of the trial.

## The Abuse Of Discretion Standard: The *Raison D'être* For Deference

In <u>State v. Hawkins</u>, 326 Md. 270, 278, 604 A.2d 489 (1992), Judge Orth articulately explained the reason for extending great deference to the trial judge in measuring the degree of prejudice:

> The fundamental rationale in <u>leaving the matter of prejudice *vel non* to the sound discretion of the trial judge</u> is that <u>the judge is in the best position to evaluate it. The judge is physically on the scene</u>, able to observe matters not usually reflected in a cold record. <u>The judge is able to ascertain the demeanor of the witnesses and to note the reaction of the jurors</u> and counsel <u>to inadmissible matters</u>. That is to say, <u>the judge has his finger on the pulse of the trial</u>.

(Emphasis supplied.)

11

This Court spoke to the same effect in <u>Allen v. State</u>, 89 Md. App. 25, 42-43, 597 A.2d 489 (1991):

> The record must compellingly demonstrate 'clear and egregious prejudice to the defendant' to warrant such a dramatic measure. <u>Because a trial judge is in the best position to evaluate whether or not a defendant's right to an impartial jury has been compromised, an appellate court will not disturb the trial court's decision on a motion for a mistrial or a new trial absent a clear abuse of discretion.</u>

(Emphasis supplied.)

Judge Seaton in this case determined that there was no such prejudice as to compel the granting of a mistrial. Judge Seaton did not remotely abuse her discretion.

**The Tiebreakers:
The Objection Was Immediately Sustained**

In a close case (this was not a close case), one that could teeter either way on the question of whether a declaration of a mistrial was compelled by the gravity of the antecedent error, certain procedural incidents sometimes serve as tiebreakers. Such procedural incidents might be whether the defendant's objection was sustained or overruled and whether a curative instruction was or was not given. This case is so clear-cut that there is no necessity even to look to the tiebreakers. It is nonetheless worthy of note that even the tiebreakers tilt in favor of the State and against the appellant. Even if, <u>arguendo</u>, the initial impropriety had been significantly more serious, it would still not have mattered.

In the State's rebuttal argument, the appellant's objection interrupted the State in midsentence. Judge Seaton's immediate ruling sustained the appellant's objection before the State could even finish the sentence. In <u>Beads v. State</u>, 422 Md. 1, 28 A.3d 1217 (2011), the Court of Appeals reversed a conviction in a case wherein the trial court erroneously

12

overruled an objection to an improper jury argument by the State. Judge Joseph Murphy's opinion for the Court, 422 Md. at 12, held that that erroneous ruling itself was the tiebreaking factor that turned what would have been an affirmance into a reversal:

> We are persuaded that <u>reversal would not be required if the danger of unfair prejudice resulting from this argument had been removed by the prompt and decisive action of the Circuit Court</u>, but the record shows that <u>the Circuit Court erroneously overruled the objections</u> interposed by Petitioner Beads' trial counsel.

(Emphasis supplied.) The opinion further explained, 422 Md. at 13-14, the significance of the ruling in its own right:

> [B]ecause the Circuit Court erroneously *overruled* objections to the improper arguments that created the danger of unfair prejudice, those erroneous rulings may well have added greater impact to the improper arguments.

(Emphasis in original.) *See also* <u>Curry v. State</u>, 54 Md. App. 250, 256, 458 A.2d 474, 478 (1983) ("[T]hey ran <u>the risk of the court's overruling the objections, thus emphasizing to the jury the "correctness" of the comments</u>.") (Emphasis supplied.)

In this case, by contrast, the appellant's objection was promptly sustained. There was no danger of prejudice from an erroneous overruling of the appellant's objection.

### The Tiebreakers:
### A Curative Instruction Was Immediately Given

In measuring the degree of ultimate prejudice, another key tiebreaker looks to the question of whether a curative instruction was given to the jury. In <u>Wilhelm v. State</u>, 272 Md. at 423-24, the Court of Appeals pointed out that even presumptively prejudicial remarks can be adequately mitigated by corrective instructions:

> When <u>in the first instance the remarks of the State's Attorney do appear to have been prejudicial, a significant factor</u> in determining whether the jury were actually misled or were likely to have been misled or influenced to the prejudice of the

13

accused <u>is whether or not the trial court took any appropriate action</u>, as the exigencies of the situation may have appeared to require, <u>to overcome the likelihood of prejudice, such as</u> informing the jury that the remark was improper, <u>striking the remark and admonishing the jury to disregard it. When such action has been taken by the trial court</u> and found to have been sufficient by the reviewing court, <u>the judgments have not been reversed</u>.

(Emphasis supplied.) *And see* <u>Washington v. State</u>, 191 Md. App. 48, 119, 990 A.2d 549 (2010).

The <u>Wilhelm</u> Court then cited a series of cases wherein instructions to the jury to "ignore" the offensive remark were deemed to have been adequate to overcome what would otherwise have been remarks deemed to be reversibly prejudicial. Conversely, the failures to have given curative instructions were held to have been reversible errors:

Contrariwise, where no such action was taken by the trial court the prejudice found to have existed were grounds for reversal.

272 Md. at 424. In this case, of course, the jury was immediately admonished by Judge Seaton to "ignore the challenged remark by the State."

## Calm Sea And Prosperous Voyage

Our response to the appellant's first contention is to hold that the trial in this case had not hit an iceberg and that Judge Seaton, therefore, acted with appropriate restraint in not issuing the order, "Abandon Ship." There was no impediment to this trial's continuing to enjoy a "Calm Sea and Prosperous Voyage."[2]

## The Infinite Variety Of Sexual Contact

---

[2] Felix Mendelssohn, "Calm Sea and Prosperous Voyage," A Concert Overture (1828).

14

In his second contention, the appellant asks, **"Did the court err in imposing multiple sentences for third-degree sexual offense?"** [Sic] A partial answer to that compound question is, "Yes, the Court did impose multiple sentences for a third-degree sexual offense." The ultimate answer, however, is, "No, the court did not err." It imposed, quite properly, multiple sentences for multiple third-degree sexual offenses. Our problem is that of identifying the pertinent units of prosecution. *See* Manigault v. State, 61 Md. App. 271, 279, 486 A.2d 240 (1985) ("A simple criminal episode may, of course, give rise to a number of separate criminal charges, some of which may be multiplied but some of which may not. The key is to identify the unit of prosecution.").

Maryland Code, Criminal Law Article, Sect. 3-307 proscribes a "Sexual offense in the third degree." It is an omnibus statute. Its dominant actus reus is non-consensual sexual contact, although sub-section (a)(4) goes on to prohibit a sexual act and sub-section (a)(5) prohibits vaginal intercourse, both depending on the age relationship between the perpetrator and the victim. In addition to generic non-consent, sub-section (a)(2) prohibits sexual contact with a victim who is substantially cognitively impaired, mentally incapacitated, or physically helpless and sub-section (a)(3) prohibits sexual contact with a victim under the age of 14 years if the perpetrator is at least four years older.

## Compiling The Units Of Prosecution

A potential multiplier in Sect. 3-307 is the umbrella term "sexual contact." Sect. 3-301(f) defines "sexual contact:"

> "Sexual contact," as used in §§ 3-307, 3-308, and 3-314 of this subtitle, means an intentional touching of the victim's or actor's genital, anal, or other intimate area for sexual arousal or gratification, or for the abuse of either party.

15

(Emphasis supplied.)

In <u>Travis v. State</u>, 218 Md. App. 410, 465, 98 A.3d 281 (2014), this Court elaborated on that definition:

> <u>What is involved in sexual contact is purposeful tactile contact and tactile sensation, not incidental touching. It is the sexually-oriented act of groping, caressing, feeling, or touching of the genital area or the anus or the breasts of the female victim</u>.

(Emphasis supplied.)

From the very wording of Sect. 3-307 itself, it is clear that the crime of non-consensual sexual contact could take various forms, each multiplied by two. It is a sexual contact for the perpetrator to engage in sexually oriented touching of the victim's genital area. It is a separate and distinct sexual contact for the perpetrator to cause the victim to engage in a sexually oriented touching of the perpetrator's genital area. There are thus two potential units of prosecution for genital touching. Once we add both the victim's and the perpetrator's anal areas to the sexual contact equation, the potential units of prosecution have reached four. The compilation of units of prosecution, however, does not stop there. In addition to the genital area and the anal area, the statute forbids the sexually oriented touching of "other intimate areas." How many such "other intimate areas" are there? The statute does not tell us, and that will be a problem for the caselaw to work out as the years go by.

The caselaw has gotten a start, however, and we know of two "other intimate areas." <u>Travis v. State</u>, 218 Md. App. at 465, has defined "sexual contact" as the sexually oriented "groping, caressing, feeling or touching of the genital areas or the anus <u>or the breasts of the</u>

16

female victim." (Emphasis supplied.) *See also* Stave v. Boozer, 304 Md. 98, 102-09, 497

A.2d. 1429 (1985).

In Bible v. State, 411 Md. 138, 153-54, 982 A.2d 348 (2009), the Court of Appeals

recognized that the human buttocks are not literally the anal area. The opinion of Judge

Adkins addressed the question of whether the buttocks, therefore, qualify as an "other

intimate area" for purposes of defining "sexual contact:"

> CL Section 3-301(f)(1) proscribes touching the genital or anal areas, but does not otherwise specify what constitutes an "intimate area." As no other statutory provision defines the term, we assume the legislature intended the word "intimate" to be understood as it is in common parlance. "Intimate" is commonly defined as "very personal; private." Certainly a reasonable person would consider the buttocks to be very personal and would find unwanted contact with that area to be particularly intrusive. Our society generally treats the buttocks as an intimate area of an individual's body. Usually, this part of the body is kept covered in public, and indeed in most private contexts.

After extensive legal analysis, Judge Adkins's opinion for the Court of Appeals

concluded, 411 Md. at 156:

> [W]e conclude that the buttocks are an intimate area within the meaning of CL Section 3-301(f)(1) because a reasonable person would recognize the extremely personal nature of that part of the anatomy. The touching of the buttocks is, therefore, proscribed by CL Sections 3-307(a)(3) & 3-308(b)(1).

(Emphasis supplied.)

Does that do it for the potential of "other intimate areas?" Who knows? The human

perception of what is an "intimate area" is by its very nature a subjective phenomenon. It

is, therefore, subject to expansion (or contraction) as the decades and the centuries roll by.

In the meantime, of course, the statute may be amended.

Within the category of a third-degree sexual offense, therefore, we have now established that no less than eight (four times two) different instances of criminal behavior could qualify as prohibited "sexual contact." Each separate variety of such criminal behavior is independent and self-standing. Separate criminal acts may be charged separately and may be the subject of separate convictions. Non-consensual sexual contact is potentially plural. Each such sexual contact is a viable unit of prosecution. The broad category into which such acts may fall, to wit, sexual contact in the collective sense, does not itself become the monolithic and indivisible unit of prosecution.

### A Helpful Analogy

The grammatical analogy between the collective term "sexual contact" and the collective term "sexual act" is an apt one. An act of anal intercourse, an act of fellatio, and an act of cunnilingus, for instance, are distinct sexual acts of a gravity comparable to that of rape. They do not become the same offense simply because they are each a particularized instance of the mutual collective term "sexual act." They are distinct units of prosecution. They do not merge into each other. A major difference between particularized instances of "sexual act" and particularized instances of "sexual contact" is that the individualized vocabulary for such particularized sexual acts is older and more familiar, and we are, therefore, less inclined to blur the line between the separate sexual acts. In handling the at times sensitive difference between the collective use of a term and particular instances of the collective, a big advantage enjoyed by "sexual act" is that it enjoys a richer and more vivid sub-vocabulary. On more familiar ground, one is less likely to trip. The same

18

meticulous care is needed, however, when dealing with distinct and particularized instances of "sexual contact."

## Consolidation Versus Multiplication

In State v. Boozer, 304 Md. 98, 102, 497 A.2d 1129 (1985), Judge McAuliffe carefully examined what is now Sect. 3-307 as "a part of the comprehensive legislative package enacted in 1976 to reform and codify this State's rape and sexual offense laws." The comprehensive effort was to bring together all of the widely scattered offenses against the person that shared a sexual orientation or motivation. This included a wide variety of sexually oriented assaults and batteries that prior to 1976 would have been charged simply as assaults and batteries. As State v. Boozer explained, 304 Md. at 109:

> As to other sexual offenses, there existed a need…to identify as sexual offenses a large and significant area of conduct which theretofore could be charged only as an assault or battery.

(Emphasis supplied.)

In this case, the appellant was convicted of and sentenced for two separate offenses, each of which would have constituted the independent crime of assault prior to 1976. Each is now classified as a third-degree sexual offense. Each involved an act of non-consensual sexual contact. As the verdict sheet more closely described the issues before the jury, Count 6 expressly charged the appellant with touching the "victim's rear end with sexual intent." Count 7, on the other hand, expressly charged the appellant with "touch[ing] the victim's breast with sexual intent." The victim's testimony, moreover, had distinctly described how the appellant, in March of 2012, had touched her on her "rear end" and repeatedly had recounted how he had on that date also fondled "her breasts." In closing argument, the

19

Assistant State's Attorney explained to the jury how each of those charges of third-degree sexual offense related to different intimate areas of the victim's body.

The appellant now argues that Sect. 3-307 is an individual and monolithic offense and does not permit the charging of different instances of a third-degree sexual offense. But for an insignificant difference between a third-degree sexual offense and a fourth-degree sexual offense, the appellant's argument here is indistinguishable from the argument brought by the appellant in State v. Boozer, 304 Md. at 99:

> The issue before us is whether a defendant once placed in jeopardy on a charge of committing a fourth degree sexual offense may be subjected to a second prosecution for attempted fourth degree sexual offense when both charges arose out of the same criminal episode but the State alleged separate acts by the defendant in each charging document. We hold that the second prosecution is permitted under the facts of this case.

(Emphasis supplied.)

The Court of Appeals, 304 Md. at 101-02, posed the contrasting arguments:

> Appellee contends that Art. 27, § 464C creates a single offense, sexual offense in the fourth degree, and that the State cannot bring more than one charge of sexual offense in the fourth degree as a result of a single criminal transaction or episode. The State contends that § 464C groups at least three separate and divisible types of prohibited conduct which may, but need not be charged as separate offenses.

(Emphasis supplied.)

The Court of Appeals initially made it clear that what would have been separate acts of assault prior to 1976 are not prohibited simply because they are now classified as instances of a fourth-degree (or third-degree) sexual offense:

> Here we must consider whether the Legislature has determined that separate acts by a defendant should not be separately prosecuted and punished.

> Initially, it is clear that <u>many of the various acts of criminal conduct grouped together in § 464C</u> historically and customarily <u>have been considered sufficiently separate and distinct</u> from each other <u>to justify separate punishment</u>, even though occurring in close temporal proximity and within the same criminal episode. <u>Prior to the 1976 revision</u> of our rape and sexual offense laws, <u>a defendant in this State could have been separately charged and punished with offenses now grouped within § 464C.</u>

(Emphasis supplied.) 304 Md. at 104.

State v. Boozer concluded, 304 Md. at 105, that what would have been separate assaults prior to 1976 are separate fourth-degree sexual offenses post-1976:

> The courts of this country have had little difficulty in concluding that <u>separate acts resulting in separate insults to the person of the victim may be separately charged and punished</u> even though they occur in very close proximity to each other and even though they are part of a single criminal episode or transaction.

(Emphasis supplied.)

Judge McAuliffe's overview of the Legislature's purpose in classifying the sexual offenses and the significance of creating third-degree and fourth-degree sexual offenses as a part of that large classification forecloses any argument that the classification scheme limited the number of charges that could be filed:

> <u>We have carefully examined the language structure and legislative history of our recently revised rape and sexual offense statutes, and we find no evidence of an intent on the part of the Legislature to depart from the well established law of this and other states with respect to a defendant's liability for multiple acts committed against a victim during a single criminal transaction.</u> In codifying the elements and penalties of rape and other sexual offenses into degrees the Legislature intended, among other things, to more carefully tailor the penalty prescribed for each crime to the seriousness of that crime. A frequent complaint under the former law was that the possibility of a life sentence and the absence of degrees of rape made many jurors reluctant to vote for conviction of rape where there were no serious injuries or other aggravating circumstances. <u>As to other sexual offenses, there existed a need</u> to distinguish between consensual and nonconsensual acts of sodomy, to define and classify "unnatural and perverted sexual practices," and <u>to identify as sexual offenses a large and significant area of conduct which theretofore could be charged</u>

21

only as an assault or battery. With respect to the offense of rape the designation of two degrees of seriousness was found sufficient. However, with respect to the other sexual offenses, the Legislature determined that the breadth of the spectrum of prohibited activity was sufficient to justify the establishment of four levels of seriousness. Nowhere in the history of the legislation is there any indication of a desire on the part of the Legislature to curtail the number of charges that might be brought for the purpose of punishing separate acts of misconduct perpetrated upon a single victim.

(Emphasis supplied.)

This appellant was properly convicted of and punished for two separate and distinct acts of particularized non-consensual sexual contact. He was not charged with sexual contact in its collective sense. The contention has no merit.

## State v. Bey:
## A False Analogy

In raising this contention, the appellant may have been led astray by Criminal Law Article, Sect. 3-315 and by State v. Bey, 452 Md. 255, 156 A.3d 873 (2017). In the special case of victims who are "under the age of 14 years" when the sexual offenses occur, the Legislature enacted what is now Sect. 3-315(a), which provides:

A person may not engage in a continuing course of conduct which includes three or more acts that would constitute violations of §3-303, §3-304, or §3-307 of this subtitle, or violations of §3-305 or §3-306 of this subtitle as the sections existed before October 1, 2017, over a period of 90 days or more, with a victim who is under the age of 14 years at any time during the course of conduct.

(Emphasis supplied.)

Sect. 3-315(d)(2) goes on to provide:

A person may not be charged with a violation of §3-303, §3-304, or §3-307 of this subtitle involving the same victim unless the violation charged occurred outside the time period charged under this section.

(Emphasis supplied.)

22

In State v. Bey, 452 Md. at 271, Judge Hotten recognized that Sect. 3-315 was the General Assembly's response to Cooksey v. State, 359 Md. 1, 7, 752 A.2d 606 (2000), which had explained the purpose of giving the State this charging option:

> All of the courts are sympathetic to the plight of both the young victims, often unable to state except in the most general terms when the acts were committed, and of prosecutors, either hampered by the lack of specific information or, when it is reported that the conduct occurred dozens or hundreds of times over a significant period, faced with the practical problem of how to deal with such a multitude of offenses.

(Emphasis supplied.)

Professor Lynn McClain of the University of Baltimore School of Law was instrumental in drafting the new legislation. In McClain, "Reforming the Criminal Law: University of Baltimore School of Law Group Goes To Annapolis," 34 U. Balt L.F. 2, 10 (2003), she explained the value of the charging option:

> In the absence of Maryland's recognition of such an offense, prosecutors had to charge multiple counts of rape or other sex crimes, and were sometimes obtaining sentences of over 100 years. Placing this crime on the books would give the prosecutors a more appropriate option (although they need not avail themselves of it).

(Emphasis supplied.)

Charging the collective conduct as a "continuing course of conduct," therefore, is a tactical option, not a prosecutorial mandate. The Court of Special Appeals, in State v. Bey, explained at 228 Md. App. 521, 542, n.11(2016):

> Charging a defendant under Crim. Law §3-315 is a choice that the prosecution elects to make; it is not a requirement under Maryland law. The State could choose to charge each individual sexual act and be burdened with the responsibility of proving specifically every occurrence of each sexual act alleged during the time frame. This statute provides relief to the prosecution from this challenging burden, made

23

> difficult inherently with younger victims who struggle with articulating exactly what sexual act occurred and with remembering the exact details and dates of each incident.

(Emphasis supplied.)

In the case before us, of course, a collective or "continuing course of conduct" pursuant to Sect. 3-315 was never charged. Indeed, it could not have been since the victim in this case was 16 years of age and Sect. 3-315 applies only in the case of "a victim who is under the age of 14 years."

In this case, non-consensual sexual contact in its collective sense was never charged and never, therefore, posed a double jeopardy barrier against the charging of these two particularized instances of sexual contact. Grammatically, a charge of "sexual contact" in its larger collective sense would, as a matter of course, embrace particularized instances of such "sexual contact," but no charge of "sexual contact" in its collective sense was ever made. In raising such a contention, however, it may well have been Sect. 3-315 and State v. Bey that led the appellant astray. He seems to have wished that Sect. 3-307 were essentially a clone of Sect. 3-315. It is not.

## The Legal Problem Is A Linguistic Problem

On close analysis, the problem that led the appellant astray on this contention turns out to be, as so many legal problems are, a linguistic problem. The phrase "sexual contact," like the noun "assault," can be used in a collective sense. As an abstract, generalized phenomenon, it is in the singular. "Sexual contact" like "assault," on the other hand, can also be used to refer to various particularized instances of the collective phenomenon. Those particularized instances may be in the plural. Context and other circumstances throw

24

light on the question of whether the term is being used as the singular collective phenomenon or as one of possibly many particularized instances that go to make up the collective phenomenon.

In this case, the surrounding circumstances made it clear that Counts 6 and 7 referred to separate and distinct particularized instances of "sexual contact" rather than to the collective phenomenon. The appellant, however, insists upon using the phrase "sexual contact" in the singular and as a reference to the collective phenomenon. Hence, his argument that Counts 6 and 7 refer to exactly the same thing. He ignores the linguistic reality that the collective phenomenon may be divided into its constituent parts. Two particularized instances do not fuse into one or into part of one.

The linguistic lesson is that the term "sexual contact" has more than one meaning and that those meanings must not be confused. In its collective sense, the term is the sum of its parts. At other times, however, the term refers to one or another of the particularized parts that enter into that collective sum. The different meanings of the term must be meticulously distinguished. The total context makes it clear that in this case Counts 6 and 7 referred to two very different and highly particularized instances of "sexual contact." The appellant insists that both counts refer, redundantly, to the same collective sense of "sexual contact." They do not. The very existence of a collective sense of a term does not preclude the existence of other meanings of the term referring to particularized instances of the collective phenomenon.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

25

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2186s19cn.pdf